AUSA Rachel Cannon (312) 353-5357
SA Jake Ryan (312) 886-7629

# UNITED STATES DISTRICT COURT

### NORTHERN _____ DISTRICT OF _____ ILLINOIS, EASTERN DIVISION

UNITED STATES OF AMERICA

**FILED**

v.

MAR 03 2005

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**CRIMINAL COMPLAINT**

SAUL TEJEDA, aka "ESKIMO,"
and the defendants on the attached list

CASE NUMBER:

05 CR 194

**05 CR 0194**

MAGISTRATE JUDGE DENLOW

(Name and Address of Defendant)

I, __Cory McGookin__, being duly sworn state the following is true and correct to the best of my knowledge

and belief.  Starting no later than in or around __January 1, 2000__, and continuing until the present, at Aurora, in

__Kane__ County, in the __Northern__ District of __Illinois__ defendant(s) did, (Track Statutory Language of Offense)

conspire with each other to knowingly and intentionally distribute and possess with intent to distribute
controlled substances, namely cocaine, in violation of Title 21, United States Code Section 841(a),

in violation of Title __21__ United States Code, Section(s) __846__.

I further state that I am a(n) __Special Agent, FBI__ and that this complaint is based on the following facts:
Official Title

See Attached Affidavit

Continued on the attached sheet and made a part hereof:  _X_  Yes  ____ No

_____
Signature of Complainant

Sworn to before me and subscribed in my presence,

__March 2, 2005__                                         at __Chicago, Illinois__
Date                                                          City and State

__Hon. Morton Denlow, Presiding U.S. Magistrate Judge__    _Morton Denlow_
Name & Title of Judicial Officer                           Signature of Judicial Officer

1.  SAUL TEJEDA, aka "ESKIMO"
2.  JUAN ALVIAR, aka "MANNY," aka "MUSTY"
3.  JOSE MELERO, aka "PEP-DOG"
4.  JESUS RENTERIA, aka "EL APA," aka "JESSE"
5.  HERIVERTO RIOS, aka "BETO"
6.  RODOLFO MADRIGAL, aka "RUDY", aka "MAGIC"
7.  APOLINAR DELGADO RIOS, aka "POLO"
8.  LARRY BOWLES, aka "LARRY LOVE"
9.  MIGUEL RIOS, aka "MIGUE"
10. ADRIANNE POTOCHNEY
11. LAWRENCE POTOCHNEY, aka "LARRY"
12. JOSE MARTINEZ, aka "KIKE"
13. ANGIE RODRIGUEZ
14. JUAN ESCAMILLA, aka "MAGU"
15. MARCO ROMERO, aka "TANK"
16. CRUZ SAMANIEGO
17. MILTON GARCIA, aka "MILK DUD"
18. CARLOS ESCALANTE
19. EUSTACIO RIOS, aka "TACHO"
20. CAROL BANKS, aka "CHICA"
21. TIMOTHY WALSH

## AFFIDAVIT

I, Cory McGookin, having been duly sworn on oath, state as follows:

1.     I am employed as a Special Agent of the United States Department of Justice, Federal Bureau of Investigation (FBI), and have been so employed for approximately three years. I am currently assigned to the Chicago Division of the FBI and work on a squad tasked to investigate street gangs and other criminal enterprises in the west suburbs of Chicago. As a Special Agent, I have participated in investigations related to the illegal distribution of controlled substances and other violations of the narcotics laws of the United States. I have received special training in the enforcement of laws concerning controlled substances, and I have been involved in various types of electronic surveillance and the debriefing of defendants, witnesses, informants, gang members, and others who have knowledge of the illegal distribution and transportation of controlled substances.

2.     I have participated in the investigation of the individuals identified below. Also participating in the investigation have been officers and detectives of the Aurora Police Department (APD) and Kane County Sheriff's Office (KCSO). This investigation focuses on the persons identified below, and others, who are engaged in a conspiracy to traffic in powder cocaine and to use a communication facility to facilitate the commission of a drug felony. This investigation also focuses on the illegal possession of firearms by convicted felons.  In addition, as outlined herein, several of the below-identified individuals are members or former members of street gangs, specifically the LATIN KINGS and the LATIN HOMEBOYS.

3.     The information contained in this affidavit is based upon investigation of the individuals identified herein.  The investigation included surveillance on various occasions, interviews of cooperating witnesses, reviews of consensually-recorded conversations, conversations recorded

1

pursuant to a court-authorized wire interception (Title III), interviews of other law enforcement officers and/or reviews of their reports, and reviews of witness' statements. This affidavit is being submitted for the limited purposes of establishing probable cause to arrest the individuals identified below. Accordingly, I have not included each and every fact known to me concerning this investigation.

4.     There is probable cause to believe that from in or about January of 2000 to the present, SAUL TEJEDA, aka "ESKIMO," JUAN ALVIAR, aka "MANNY," aka "MUSTY," JOSE MELERO, aka "PEP-DOG," JESUS RENTERIA, aka "EL APA," aka "JESSE," HERIVERTO RIOS, aka "BETO, RODOLFO MADRIGAL, aka "RUDY", aka "MAGIC," APOLINAR DELGADO RIOS, aka "POLO," LARRY BOWLES, aka "LARRY LOVE," MIGUEL RIOS, aka "MIGUE," ADRIANNE POTOCHNEY, LAWRENCE POTOCHNEY, aka "LARRY," JOSE MARTINEZ, aka "KIKE," ANGIE RODRIGUEZ, JUAN ESCAMILLA, aka "MAGU," MARCO ROMERO, aka "TANK," CRUZ SAMANIEGO, MILTON GARCIA, aka "MILK DUD," CARLOS ESCALANTE, EUSTACIO RIOS, aka "TACHO," CAROL BANKS, aka "CHICA," and TIMOTHY WALSH conspired with each other, and with others known and unknown, to knowingly and intentionally distribute and possess with intent to distribute cocaine, in violation of Title 21, United States Code, Section 846. Accordingly, this affidavit is being submitted in support of a criminal complaint and request for arrest warrants for these individuals.

5.     The following is a summary of the paragraphs of this affidavit that refer to the particular individual:

    1.     SAUL TEJEDA, aka "ESKIMO" (TEJEDA is referred to *passim*)

    2.     JUAN ALVIAR, aka "MANNY," aka "MUSTY" (ALVIAR is referred to in

2

paragraphs 8, 14, 19, 35, 37, 38, 42, 43, 60 - 93, 209 - 212)

3.    JOSE MELERO, aka "PEP-DOG" (MELERO is referred to in paragraphs 8, 14, 19, 94 - 113, 179- 180, 195-196, 295)

4.    JESUS RENTERIA, aka "EL APA," aka "JESSE" (RENTERIA is referred to in paragraphs 9, 19, 27, 28, 36, 86, 88, 115 - 130, 132 - 139)

5.    HERIVERTO RIOS, aka "BETO" (RIOS is referred to in paragraphs 9, 14, 19, 22, 23, 24, 25, 32, 38, 39, 40, 41, 119 - 122, 185 - 202)

6.    RODOLFO MADRIGAL, aka "RUDY", aka "MAGIC" (MADRIGAL is referred to in paragraphs 9, 14, 19, 32, 95, 100, 102, 103, 106, 107, 108, 179-180, 187- 188, 195, 203 - 212, 295)

7.    APOLINAR DELGADO-RIOS, aka "POLO" (DELGADO-RIOS is referred to in paragraphs 10, 95, 140, 142, 144 - 165, 295)

8.    LARRY BOWLES, aka "LARRY LOVE" (BOWLES is referred to in paragraphs 10, 14, 19, 38, 43, 102, 103, 166 - 184, 209, 306)

9.    MIGUEL RIOS, aka "MIGUE" (RIOS is referred to in paragraphs 10, 12, 19, 45, 95, 295 - 306)

10.    ADRIANNE POTOCHNEY (POTOCHNEY is referred to in paragraphs 11, 19, 42, 54, 74, 75, 129, 130, 138, 213 - 229, 231, 236 - 238, 262 - 264, 277 - 278)

11.    LAWRENCE POTOCHNEY, aka "LARRY" (POTOCHNEY is referred to in paragraphs 11, 19, 219 - 222, 229 - 230, 231 - 242)

12.    JOSE MARTINEZ, aka "KIKE" (MARTINEZ is referred to in paragraphs 12, 19, 253 - 266, 269)

3

13. ANGIE RODRIGUEZ (RODRIGUEZ is referred to in paragraphs 12, 223, 225, 256 - 257, 259, 262, 266 - 278)

14. JUAN ESCAMILLA, aka "MAGU" (ESCAMILLA is referred to in paragraphs 12, 279 - 294)

15. MARCO ROMERO, aka "TANK" (ROMERO is referred to in paragraphs 12, 14, 243 - 252)

16. CRUZ SAMANIEGO (SAMANIEGO is referred to in paragraphs 12, 53, 129, 130, 141, 143, 144, 307 - 316)

17. MILTON GARCIA, aka "MILK DUD" (GARCIA is referred to in paragraphs 12, 14, 296, 317 - 328)

18. CARLOS ESCALANTE (ESCALANTE is referred to in paragraphs 12, 127, 128, 180, 329 - 346)

19. EUSTACIO RIOS, aka "TACHO" (RIOS is referred to in paragraphs 12, 327 - 328, 347 - 358)

20. CAROL BANKS, aka "CHICA" (BANKS is referred to in paragraphs 12, 64, 103, 136, 137, 359 - 371)

21. TIMOTHY WALSH (WALSH is referred to in paragraphs 12, 31, 372 - 383)

## I. OVERVIEW OF THE INVESTIGATION

6. Agents learned in around June of 2002, from APD, CW-2, and CW-3, as well as others, that SAUL TEJEDA is a kilogram-quantity cocaine dealer, receiving as much as 2 kilograms of cocaine per week. As outlined in this complaint, TEJEDA buys, stores, and divides the kilograms he purchases into fractional quantities for resale. TEJEDA carries out his drug distribution operation

4

mainly through the assistance of fellow LATIN KINGS and/or former LATIN HOMEBOYS. The LATIN KINGS and LATIN HOMEBOYS were Aurora gangs that coexisted peacefully with one another, each distributing cocaine, until in 1997 the LATIN HOMEBOYS became too powerful. Then, the LATIN KINGS forced them to "flip" KING (become LATIN KINGS), disavow all gang membership, or be killed.

7.     With the assistance of fellow members of the LATIN KING STREET GANG in Aurora, former LATIN HOMEBOY gang members, as well as non-gang members, TEJEDA uses a cell phone to arrange the distribution of cocaine to various customers. TEJEDA's fellow gang members and other co-conspirators frequently accompany him as he conducts drug transactions, and frequently take on various roles in order to assist him. For example, TEJEDA's fellow gang members and co-conspirators serve as lookouts for police, direct him to various customers, store cocaine for him, help disguise him, supply him with cocaine, and work as "enforcers" by protecting him against rival gang members. Some of these members have been intercepted using TEJEDA's phone and participating in drug transactions themselves.

8.     Several individuals play particularly important roles in this conspiracy. For example, JUAN ALVIAR is TEJEDA's and the Aurora LATIN KING'S chief Enforcer. TEJEDA calls ALVIAR when he is shot at or wants to commit violent acts against rival gang members. JOSE MELERO was the former Enforcer for the Aurora LATIN KINGS, and he assists TEJEDA in stealing cocaine and evading law enforcement detection. In addition, the two share guns between them.

9.     JESUS RENTERIA assists TEJEDA by allowing TEJEDA to store cocaine at RENTERIA's residence and by driving RENTERIA to cocaine deals. HERIVERTO RIOS also drives TEJEDA to pick up cocaine. RODOLFO MADRIGAL also allows TEJEDA to use his car (a van) to

distribute cocaine, and has assisted TEJEDA and MELERO in stealing cocaine.

10.  APOLINAR DELGADO-RIOS and LARRY BOWLES are TEJEDA's two known suppliers. DELGADO-RIOS and defendant MIGUEL RIOS, for a "cut" of the proceeds, also provide TEJEDA with the identity of other drug distributors from whom TEJEDA can steal drugs. BOWLES, in addition to supplying TEJEDA, also provides "security" by serving as a lookout for law enforcement. BOWLES also allows TEJEDA to store TEJEDA's motorcycle in his garage. TEJEDA uses his motorcycle to deliver cocaine fully concealed by his helmet.

11.  ADRIANNE POTOCHNEY is TEJEDA's live-in girlfriend. She takes customers' orders and provides "security" to TEJEDA by serving as a lookout for law enforcement through her monitoring of a police scanner. LARRY POTOCHNEY assists TEJEDA in renting cars from which to distribute cocaine. Delivering cocaine from rental cars assists TEJEDA in concealing his identity and evading law enforcement detection.

12.  JOSE MARTINEZ, ANGIE RODRIGUEZ, JUAN ESCAMILLA, MARCO ROMERO, MIGUEL RIOS, CRUZ SAMANIEGO; MILTON GARCIA, CARLOS ESCALANTE, EUSTACIO RIOS, CAROL BANKS, and TIMOTHY WALSH are all cocaine customers of TEJEDA's who resell the cocaine they buy from TEJEDA.

13.  This complaint outlines the gang relationships of several of the coconspirators, the importance of firearms and violence to TEJEDA and his drug distribution operation, the history of the LATIN KINGS and LATIN HOMEBOYS, various cooperating witnesses and controlled buys of cocaine from TEJEDA, and the two-month long court-authorized wiretap during which all of the coconspirators were intercepted.

6

## A.    TEJEDA AND THE LATIN KINGS/LATIN HOMEBOYS

14.    APD records and CW-6 have described defendants SAUL TEJEDA, JUAN ALVIAR, JOSE MELERO, RODOLFO MADRIGAL, and LARRY BOWLES as current LATIN KING gang members. Of these defendants, APD records and CW-6 have confirmed that all were former members of the LATIN HOMEBOYS.[1] CW-6 has stated that defendants MARCO ROMERO, HERIVERTO RIOS, and MILTON GARCIA were formerly LATIN HOMEBOYS as well. The remaining defendants have no known gang membership.

### 1.    HISTORY OF THE AURORA LATIN KINGS AND HOMEBOYS

15.    I am aware that the LATIN KING STREET GANG has existed in Aurora, Illinois since the 1980s. The LATIN KINGS are an especially violent street gang, considered to be responsible, according to APD records, witness interviews, and source information, for scores of kidnappings, robberies, and shootings in that city, many of which resulted in death or serious injury. For example, to date, there have been 248 homicides in Aurora since 1990, 183 of which are believed to be gang-related (nearly 75%). Of those 183 homicides that are gang-related, 89 are believed to involve LATIN KINGS as either victims or perpetrators (nearly 50%). In addition, the LATIN KINGS are involved with both the importation of cocaine from other parts of the country and in the distribution of that cocaine to members of their own gang and to others. The LATIN KINGS in Aurora center their activities in a large neighborhood located on the east side of the city, although they are known to operate in other parts of the city as well.

16.    The LATIN HOMEBOYS street gang formed in the late 1980s. They also imported and distributed cocaine in and around the Aurora area. At first, the LATIN KINGS and LATIN

---

[1] CW-6 is a former LATIN HOMEBOY.

7

HOMEBOYS street gangs were friendly with one another, and many LATIN KING members even described themselves as "OLD HOME BOYS," when they were in fact LATIN KINGS, in order to avoid law enforcement scrutiny beginning to focus on the LATIN KINGS. However, around 1997, the LATIN HOMEBOYS began to distribute cocaine on a large scale, thereby becoming a threat to the LATIN KINGS. Thus, in an effort to consolidate their power, the LATIN KINGS engaged in a "hostile takeover" of the LATIN HOMEBOYS, and gave members of the LATIN HOMEBOYS the choice between "flipping King" (i.e. becoming members of the LATIN KINGS), disavowing all gang affiliation, or being killed. As a result of these ultimatums, according to source and gang specialist information, the LATIN HOMEBOYS no longer exist as an independently functioning gang. However, many former LATIN HOMEBOYS remain extremely close to other former LATIN HOMEBOYS and/or current LATIN KINGS, despite their disavowal of the LATIN HOMEBOYS.

17.    The primary business of the LATIN KINGS in Aurora is the sale of powder cocaine, and members of the LATIN KINGS conspire to store, package and distribute cocaine. LATIN KING members also collect, count, and store the cash proceeds of their drug trafficking at various locations in and around Aurora. In addition, members of the LATIN KINGS use violence to establish and maintain power in Aurora. Currently, the LATIN KINGS are the most powerful street gang in Aurora, and they fight with non-LATIN KING gang members in an effort to maintain their dominance in the cocaine trafficking market.

18.    The LATIN KINGS are able to maintain their position as the most powerful street gang in Aurora because they are the largest street gang in Aurora and they control the widest geographical area. In addition, they are the best organized. For example, the LATIN KINGS have a written manifesto that sets out their laws and credos. In addition, the gang has an elected governing body

8

consisting of an Inca, who heads the gang, a Casique, who functions as a vice president, and an Enforcer, who administers discipline within the gang and is responsible for arming members and distributing guns and weapons throughout the gang. There is also a crown council that serves to check the power of the Inca, Casique, and Enforcer. Lastly, the gang holds monthly meetings and supplements the income it receives through cocaine trafficking by requiring each member to pay monthly dues in the amount of $20.

## 2. THE CONSPIRACY'S USE OF GUNS AND VIOLENCE

19.     CW-6, APD records, and wiretapped conversations reveal that during the course of the conspiracy charged in this complaint, defendants SAUL TEJEDA, JUAN ALVIAR, JOSE MELERO, JOSE ENRIQUE MARTINEZ, JESUS RENTERIA, HERIVERTO RIOS, MIGUEL RIOS, LARRY BOWLES, ADRIANNE POTOCHNEY, LARRY POTOCHNEY, and RODOLFO MADRIGAL discussed possessing, or were observed possessing firearms.[2] I know from my training and experience, as well as the experience of other law encodement agents who specialize in investigating gangs, that drug dealers frequently carry guns and other weapons. They do so (1) to protect themselves from robbery of their drugs by rival gang members and others, (2) to protect their drugs, which are extremely valuable, often worth thousands of dollars, and (3) to use in robbing other drug dealers of valuable narcotics and cash. Because most gang members are involved in distributing drugs, and for the reasons just stated, I know that gang violence and drug dealing go hand-in-hand.

20.     Both CW-6, a former LATIN HOMEBOY, and CW-2, also a former LATIN HOMEBOY,

---

[2] Of this group, all are convicted felons except JOSE ENRIQUE MARTINEZ, JESUS RENTERIA, and ADRIANNE POTOCHNEY.

9

have confirmed that gang members generally carry guns to protect their drug business, as drug dealers are frequently robbed, and that they carry guns to "come up," or rob others, of large quantities of drugs. Both have also stated that SAUL TEJEDA carries guns to protect his drugs.

21.     Although CW-6 has related that rival gang members can, and do, coexist peacefully in Aurora, they can only do so as long as each gang member is not a wealthy drug trafficker. For example, CW-6 explained that Gangster Disciple gang members in Aurora can, and do, live peacefully on a block with LATIN KINGS. If any Gangster Disciples, however, become profitable drug dealers, then LATIN KINGS will seek to rob them, and will not hesitate to use violence to do so.

22.     The following call intercepted pursuant to the Title III interception described below provides an example of the intertwined relationship of guns and drugs in this conspiracy. On October 4, 2004, at approximately 7:39 p.m. (call# 9089), former LATIN HOMEBOY HERIVERTO RIOS[3] placed an outgoing telephone call to TEJEDA. RIOS stated that he had just received a phone call about a guy who was threatening to shoot up his (RIOS') house or shoot him (RIOS). RIOS wanted to stop at TEJEDA's house before going home because he wanted to be "heated up by the time I come by my way." RIOS then stated, "I'm gonna let this dude have it if he comes by my crib."

23.     RIOS explained that earlier a female had called the cops and "dude" ran downstairs, gave "it" to Individual N, and "broke." Individual N then threw "it" outside, and RIOS stated, "That's when I grabbed it. Now the shit was fronted to this dude by the dude that lives downstairs with Individual N's aunt, and he's planning with his boys in a white excursion outside right now." RIOS then said that "the girls" had called him and told him to be careful, and said that the "dude" had tried to force

---

[3] APD records and CW-6 have identified HERIVERTO RIOS as a former LATIN HOMEBOY.

one of the girls to jump in his car and point out RIOS' house. RIOS stated that the girl had refused, but that the guy said that he planned to go by and shoot RIOS' crib nonetheless. RIOS stated that the "Chero" (Mexican) was the one doing all the threatening.

24. TEJEDA said, "Tell them niggas to come through right here on Ohio and Superior!" RIOS laughed and said, "When I get to the crib, I'm gonna go by your way first bro, I'm gonna get that thing or we can go for a ride if you want bro...we're gonna scare these dudes away quick...cause they ain't getting shit back bro, I was gonna give some back to tell you the truth but the first thing that came out of his mouth is that I'm gonna come shoot him instead of working something out with me." TEJEDA says "Fuck that nigga man, give me a call when you get off."

25. Based on this investigation and my experience, and the experience of other law enforcement agents, RIOS was describing an incident when a female called the police. An unknown male with cocaine ran down the stairs and gave the cocaine ("it") to Individual N, and then ran away ("broke"). Individual N then threw the cocaine ("it") outside. RIOS grabbed the cocaine from outside and kept it. An unknown Mexican ("Chero") had tried to force the "girls" to disclose where RIOS lives. This Mexican had friends in a car who were threatening to shoot at RIOS' house or shoot RIOS himself for taking the cocaine. RIOS wanted to stop by TEJEDA's house to get a gun ("that thing") from TEJEDA before going home ("Heated up by the time I come by my way"). RIOS also suggested that they get the gun and then go intimidate the individuals, through the use of violence if necessary.[4]

---

[4] Following this call, surveilling agents observed RIOS meet with TEJEDA at TEJEDA's former residence on 1000 Superior Street, and then observed the two of them get in a car. Agents attempted to curb RIOS and TEJEDA, but the two took agents on a long car chase. Agents lost sight of the two on many occasions, and upon finally pulling them over, did not find a gun on either. Agents believe either or both possessed guns upon leaving TEJEDA's residence, but threw them out of the car during the chase.

11

### a. TEJEDA'S POSSESSION OF A FIREARM FOLLOWING THE OCTOBER 9, 2004 SHOOTING OF HIS HOME BY RIVAL GANG MEMBERS

26. On September 23, 2004, and again on October 9, 2004, rival gang members shot into TEJEDA's then-home at 1000 Superior Street in Aurora. Intercepted calls between TEJEDA and his co-conspirators following these shootings discussed taking retaliatory action against the rival gang member believed responsible, who was an AMBROSE street gang member. These calls have been summarized in paragraphs 68-90. Surveilling agents actually heard shots being fired while watching TEJEDA's then-home, and have since observed bullet holes visible in the east side and west door of TEJEDA's residence.[5]

27. On both occasions, Aurora Police surrounded TEJEDA's home to process the crime scene. TEJEDA left and/or stayed away from his residence on both occasions. After the October 9, 2004 shooting, agents intercepted TEJEDA asking about a gun his mother had hidden in his house following the shooting. During this call, which was in Spanish and occurred on October 9, 2004, at approximately 3:23 p.m., defendant JESUS RENTERIA answered,[6] and TEJEDA asked to speak to his mother. TEJEDA's mother told TEJEDA that she had put "the bag" in the bedroom on top of the closet.

28. Approximately four minutes later, TEJEDA called again and asked defendant RENTERIA to speak with his mother. TEJEDA again asked his mother "its" location. His mother again told him

---

[5] These calls are included and described in order to show the association among some of the conspirators charged in this complaint, and to show that TEJEDA, a convicted felon, possesses guns. Both CW-3 and CW-6 have related, however, that these shootings were not committed because of drugs, but because of a rivalry between TEJEDA and an AMBROSE gang member.

[6] RENTERIA's voice identification is discussed in footnote 37.

that "it" was on top of the closet under the shirt, unless the cops came in and took "it." TEJEDA's mother then described the closet. TEJEDA, who had clearly returned to his residence, said he still could not find it, and asked what color the shirt was. TEJEDA's mother then asked a female in the background whether the "PISTOLA" (pistol) was still wrapped up. TEJEDA then complained that a door had been left open. TEJEDA's mother then asked if TEJEDA had found "it" yet, and when TEJEDA said no, his mother told him that "it" was on the upper part of the apartment. TEJEDA's mother then shouted to a woman, whom agents know from CW-2 to be TEJEDA's sister. TEJEDA's sister told their mother that "it" was in her (the sister's) closet. After a bit, TEJEDA said that he had found it.

29.      Based on this investigation and my experience, and the experience of other law enforcement agents, upon returning to his house, TEJEDA realized that his gun was missing. He called his mother, and asked her where she had put it. His mother, who had become nervous because of the police presence outside their home due to the shooting, had hidden the gun in a closet. When TEJEDA was not able to find the gun, he became nervous as well. He then scolded his mother for leaving the door to the home unlocked, and feared that police had taken the weapon. TEJEDA was finally directed to the proper closet, where he then found his gun.

### 3. MANY OF TEJEDA'S CO-CONSPIRATORS ARE CURRENT LATIN KINGS AND/OR FORMER LATIN HOMEBOYS

30.      As outlined in the two events described below, and in many of the summarized calls, TEJEDA carries out his drug distribution operation mainly through the assistance of fellow LATIN KINGS and/or former LATIN HOMEBOYS.[7]

---

[7] Most of TEJEDA's drug purchasers who are strictly customers/resellers are not gang members.

13

### a. OCTOBER 24, 2004 SEIZURE OF COCAINE FROM TEJEDA WHILE HE WAS RIDING WITH LATIN KING RUDOLFO MADRIGAL AND FORMER LATIN HOMEBOY HERIVERTO RIOS

31.     On October 24, 2004, while on surveillance, agents observed defendant TIM WALSH, a cocaine dealer who regularly purchased cocaine from TEJEDA, in the parking lot of a Walgreens in Aurora. A short time later, agents observed TEJEDA, while driving a Monte Carlo registered to defendant HERIVERTO RIOS, park near WALSH. TEJEDA then left his car and got into WALSH's. Minutes later, TEJEDA returned to the Monte Carlo and drove away.

32.     Believing they had just witnessed a drug sale, and intending to seize any remaining drugs TEJEDA might have on him, agents followed TEJEDA until an Aurora Police Department officer could pull him over.[8] Upon approaching the Monte Carlo, agents observed TEJEDA in the driver's seat adjusting his groin area, defendant HERIVERTO RIOS in the passenger seat, and defendant RODOLFO MADRIGAL in the rear seat. $5000 in cash lay on the floor of the front passenger seat near RIOS. APD then arrested TEJEDA for his alleged pointing of a gun at a rival gang member while riding with another LATIN KING, Individual A.[9]

33.     During his booking, TEJEDA was thoroughly searched, and 5 bags of cocaine with a total weight of approximately 7.4 grams were found hidden in his groin area.

---

[8] APD was looking for TEJEDA in connection with his alleged pointing of a gun at a rival gang member earlier that day.

[9] Individual A, who had fled from the police earlier that day as a result of the incident, was ultimately apprehended by APD after a chase. As officers were arresting Individual A, they heard his phone "chirp," and heard a male voice ask if Individual A had escaped or been caught. The phone display showed the name "Eskamo" [sic], TEJEDA's nickname, and a direct-connect number that agents learned from CW-6 and others belonged to TEJEDA.

14

**b.** **LATIN KINGS TEJEDA, ALVIAR, AND FORMER LATIN HOMEBOY HERIVERTO RIOS'S ATTEMPTED PURCHASE OF 10 KILOS OF COCAINE**

34.     In February of 2005, CW-6 informed agents that s/he had a cocaine source in Utah who had recently called him/her offering to bring 10 kilograms of cocaine to the DeKalb, Illinois area. Agents then told CW-6 to pass the information to TEJEDA. When CW-6 did so, TEJEDA told CW-6 that he was interested in purchasing ten kilos of cocaine from this individual. CW-6 told TEJEDA that the source wanted $30,000 to $40,000 in cash, and that the remainder of the money could be paid at a later time.

35.     On February 10, 2005, CW-6 was outfitted with a body-recording device, and had recorded conversations with TEJEDA and ALVIAR. Referring to the Utah connection, TEJEDA told ALVIAR that a drug connection was back, and ALVIAR told TEJEDA that he wanted in on the deal. ALVIAR agreed to put in $10,000 - $15,000 in cash. ALVIAR mentioned that he had "15 stacks," which based on this investigation and my experience I understand to be $15,000, and a "half brick," which I understood to be a ½ kilo of cocaine.

36.     On February 15, 2005, CW-6 was again outfitted with a body-recording device, and s/he and TEJEDA got into a rented Infinity SUV. The conversations set out below were then recorded. TEJEDA had the keys to the car and drove them to the apartment of defendant JESUS RENTERIA, aka EL APA. CW-6 related that the two went to RENTERIA to ask if he would drive them to conduct a drug transaction. RENTERIA said he could not because his driver's license was suspended.

37.     TEJEDA then drove them to ALVIAR's new residence, 273 Parkside Avenue, in Aurora. Upon arriving, ALVIAR went to the back bedroom to retrieve the share of money he was

15

contributing towards the purchase of the ten kilograms of cocaine. ALVIAR returned with $15,000 in cash, and offered to add $5,000 if TEJEDA wanted to wait for it. TEJEDA then produced $15,000 in cash, which he threw on the bed with ALVIAR'S money. Around this time, TEJEDA mentioned seeing a black van and a gray van, and stated that the "narcos," or police, all drive vans.[10]

38.     TEJEDA and CW-6 then left, leaving the money at ALVIAR'S, and drove to defendant HERIVERTO RIOS' place of employment, the Card Outlet. There, they asked if RIOS would drive them to "pick something up." RIOS agreed, on the condition that CW-6 and TEJEDA each pay him $1000. RIOS asked if he was driving them to a "gank move" (a robbery of drugs), or if they were going to "pay for it." The three drove to a Wendy's so that TEJEDA could explain to RIOS what they were planning to do. After RIOS agreed to serve as the driver, they dropped RIOS off at his job so that he could arrange to leave. TEJEDA and CW-6 then picked up RIOS again, and the three drove back to ALVIAR'S residence. As they pulled up, defendant LARRY BOWLES was also arriving. TEJEDA then went inside to get the money they had previously left there. CW-6 then turned to RIOS and explained that they were going to get "ten birds." When TEJEDA came back out, RIOS drove the three of them to I-88, taking a route with little traffic at TEJEDA's request so that they could easily determine whether they were being followed.

39.     As the three approached the DeKalb toll plaza, their car, pursuant to agent's use of an ignition-kill switch, went dead. In the car, TEJEDA told RIOS to hit the parking brake, because they were within feet of the plaza and needed to stop. The Illinois State Police, at agent direction, arrived and assisted the three in trying to move their vehicle. Because the car legitimately could not be placed in neutral gear, the Trooper told them that they would have to call a flat bed tow truck to

---

[10] Surveilling agents in this case were hidden inside both black and grey vans.

move the vehicle. The three were then questioned and searched by Troopers, and transported from the toll to an ISP sub-station.[11] When asked how much money TEJEDA had on him, he told the Trooper he had $8,000 which he was going to use to buy a Buick Skylark he had located on Auto Trader. TEJEDA later told the ISP Trooper that the money was tax return money. Troopers ultimately seized $30,896 from TEJEDA, plus $2500 that CW-6 had on him as "show" money. Around this time, an undercover officer posing as the source of supply called CW-6, and CW-6 told him they were with the police. TEJEDA then became angry with CW-6, telling CW-6 that s/he should not have told the source anything, as TEJEDA did not want the source to be frightened.

40.     RIOS was transported to a public spot in DeKalb so that he could arrange a ride for the three. CW-6 and TEJEDA were taken to the sub-station so that the money on them could be counted and seized, and a receipt provided to Tejeda.

41.     CW-6 and TEJEDA were then driven by Troopers into DeKalb to meet with RIOS.  After being dropped off by the ISP Troopers, TEJEDA called an attorney, and handed the phone to CW-6. The attorney told them that the money should not have been taken and that he would look into it and contact them.

42.     An unidentified friend of RIOS's then drove the three to a house in Aurora where TEJEDA'S car and girlfriend, defendant ADRIANNE POTOCHNEY, were. On the way there, TEJEDA was trying to come up with ways to get the money back, and asked CW-6 to try to get documents that would help TEJEDA get his money back. When they arrived, POTOCHNEY asked what had happened, and became angry once she learned that the money was gone. CW-6 and TEJEDA then

---

[11] Around this time, Troopers accidentally removed the body-recording device CW-6 was wearing, and conversations following its removal were not recorded.

left and drove to ALVIAR's residence on Parkside.

43.     When they arrived, defendant LARRY BOWLES was still at the residence.  BOWLES told

TEJEDA and CW-6 that he had been ready to chip in $5000, but could not because he was waiting

for someone to drop off $300.  BOWLES also told CW-6 and TEJEDA that once ALVIAR had

learned what happened, he threw up on himself.  CW-6 observed vomit still on ALVIAR's shoes.

TEJEDA assured ALVIAR that he would get his $15,000 back, even if it meant that TEJEDA had

to give ALVIAR his (TEJEDA's) motorcycle and gold chain.  ALVIAR commented that "someone

put a switch" in their rental.

## B.     COOPERATING WITNESSES AND CONTROLLED BUYS

44.     Some of the information in this affidavit relating to the current investigation has been

provided by cooperating witnesses (CWs).  Specifically, information referenced in this Affidavit has

come from CW-2, CW-3, CW-6, and CW-7.  In addition, CW-2, CW-3, and CW-7 have each

participated in controlled buys of powder cocaine from TEJEDA and other members of the

conspiracy.

### 1.     CW-2

45.     CW-2 has provided reliable information concerning TEJEDA's cocaine trafficking.  During

the period CW2 had been working with the current investigation, FBI agents spoke to CW2 in person

or over the telephone numerous times.  Information provided by CW2 has proven reliable, and has

been corroborated by consensually recorded telephone conversations, surveillance, and body

recordings occurring on January 27, 2004 and January 30, 2004 with defendants MIGUEL RIOS and

18

SAUL TEJEDA respectively.[12]

46.     CW-2's knowledge about SAUL TEJEDA and his co-conspirators stems from CW2's longtime association with TEJEDA. In addition, CW2 used to buy cocaine from TEJEDA for personal use, and CW2 has spent time riding in TEJEDA's vehicle as TEJEDA conducted his drug transactions. CW2, to date, has received no payments from federal law enforcement officials for providing information. CW2 was, however, provided with a cellular pre-paid telephone (valued at approximately $40) loaded with 100 minutes to facilitate contact with case agents and to make a consensual recorded telephone call on January 30, 2004. On February 18, 2004, CW2 was closed as a federal confidential witness due to CW2's failure to remain in constant contact with case agents.

47.     On January 30, 2004, CW-2 conducted a controlled cocaine purchase with TEJEDA as directed by Affiant. Although CW-2 was outfitted with a body-recording device, the device malfunctioned during the buy, and thus, no conversation from the buy was recorded. However, agents drove CW-2 to TEJEDA's residence in order to conduct the controlled purchase, dropped him/her off nearby, and surveilled him/her as s/he entered the residence. Prior to dropping off CW-2, agents searched him/her for the presence of drugs and money, with negative results. Agents then provided him/her with pre-recorded funds to purchase cocaine from TEJEDA. After dropping off CW-2, agents observed CW-2 enter TEJEDA's residence at 1000 Superior Street, Aurora, Illinois. When CW-2 returned to agents' car, s/he had with him/her a quarter-ounce of cocaine, or 7 grams, which s/he stated s/he had bought from TEJEDA for $190. Agents had surveilled CW-2 as s/he

---

[12] CW-2 has burglary and domestic battery convictions. In addition, CW-2 has recent arrests for criminal trespass to residence, domestic violence, and disorderly conduct. Although CW2 had requested assistance regarding these two arrests in exchange for his/her cooperation, agents have made no promises relating to these arrests, and to date, the government has never interceded on behalf of CW2 with regard to these two arrests.

walked from TEJEDA's house to agents' car, and were also able to monitor him/her through a transmitter s/he was wearing. CW-2 was then again searched, with negative results aside from the cocaine and remaining buy money just described.

### 2. CW-3

48.     CW-3 has provided reliable information concerning TEJEDA's cocaine trafficking. Since February 4, 2004, CW3 has been interviewed many times by Affiant regarding the activities of SAUL TEJEDA and his associates. CW3 has proven reliable, and CW3's information has been corroborated by pen register information, other informants, surveillance, and multiple consensual telephone and body recordings between the dates of February 4, 2004 and May 20, 2004. In consideration for CW-3's cooperation, to date, the government has paid CW-3 $4600.[13]

49.     CW3's knowledge stems from his/her numerous prior purchases of cocaine from SAUL TEJEDA, which s/he in turn resold for profit. CW3 has related that s/he worked with TEJEDA to sell cocaine for approximately one and one-half years. S/he began working with the Aurora Police Department as a cooperating witness in approximately January 2004, and with the FBI in approximately February of 2004, and has not purchased cocaine from TEJEDA except at law enforcement direction since January 2004. Prior to January 2004, however, for a period of approximately six to seven months, CW3 was purchasing about an ounce of cocaine daily from TEJEDA. From his/her numerous purchases, CW3 has become familiar with others who also purchase cocaine from TEJEDA.

50.     On February 4, 2004, CW-3 conducted a controlled cocaine purchase with TEJEDA as directed by Affiant. Prior to the buy, CW-3 was outfitted with a body-recording device and searched

---

[13] CW-3 has one conviction for obstruction of justice.

for the presence of drugs and money, with negative results. CW-3 then went to TEJEDA's residence at 1000 Superior Street, while surveilled by agents, and bought one ounce of cocaine from TEJEDA for $650 in pre-recorded funds. After leaving the residence and joining agents, CW-3 was again searched for drugs and money with negative results, aside from the aforementioned cocaine. On February 11, 2004, CW-3 conducted another controlled cocaine purchase with TEJEDA as directed by Affiant. CW-3 was again outfitted with a body-recording device, and was again searched before the buy for the presence of drugs or money, with negative results. During this buy, CW-3 met TEJEDA at a public location and bought one ounce of cocaine from him for $650. Agents were able to surveil the buy as it occurred. Afterwards, CW-3 was again searched for the presence of drugs and money, with negative results aside from the aforementioned cocaine.

### 3.   CW-6

51.   CW-6 has provided reliable, timely information to the FBI concerning this investigation from December 2004 to the present. During the pendency of his/her cooperation, FBI agents have spoken to CW-6 in person and over the telephone numerous times, sometimes on a daily basis. Much of the information provided by CW-6 has been corroborated by consensual body recordings, surveillances, court-authorized interceptions, and other cooperating witnesses. To date, CW-6 has not received any payments from federal law enforcement officials for his/her cooperation. However, CW-6 has received a total of $800 from the government to be used for cellular telephone phone cards and gasoline for CW-6's continued contact with TEJEDA, TEJEDA's co-conspirators, and agents assigned to this investigation. In addition, CW-6 was intercepted during the wiretap described below, and will be charged with participating in the criminal conspiracy described herein. CW-6 is

21

cooperating in hopes of receiving a lower sentence in exchange for his/her cooperation.[14]

52.     CW-6 has known TEJEDA for over twenty years.  S/he has ridden with and observed TEJEDA distributing drugs since approximately late 2001.  From early 2002 until approximately February of 2004, CW-6 and TEJEDA worked together on nearly a daily basis distributing cocaine. From around February 2004 until around June 2004, CW-6 saw TEJEDA almost daily, but only worked with him to distribute cocaine about once a week.  From around November 2004 until the present, CW-6 and TEJEDA have spoken on the phone or seen one another almost daily.  In addition, from about late 2001 until the summer of July of 2002, TEJEDA and CW-6 lived together.

### 4.   CW-7

53.     As confirmed by the controlled delivery described herein, CW-7 has provided reliable information concerning TEJEDA and co-conspirator CRUZ SAMANIEGO's cocaine trafficking.[15] CW-7 related that SAMANIEGO is a drug dealer who is supplied by TEJEDA.  CW-7 was paid $500 for his/her ounce -buy of cocaine from TEJEDA through defendant SAMANIEGO as described herein.  On November 22, 2004, CW-7 conducted a controlled cocaine purchase with TEJEDA as directed by Affiant.  CW-7 was outfitted with a body-recording device for the buy, and was searched beforehand for the presence of drugs or money, with negative results.  During the buy, CW-7 met with CRUZ SAMANIEGO and TEJEDA at SAMANIEGO's residence, 173 North Loucks Street, in Aurora.  CW-7 bought one ounce of cocaine and paid TEJEDA $630 in pre-recorded funds. Defendant SAMANIEGO brokered the transaction between the two by introducing them, and

---

[14] CW-6 has convictions for narcotics, traffic, and firearms offenses, as well as a pending narcotics case that will be adopted federally.

[15] CW-7 is not known to have any convictions.

informed CW-7 at the outset of the deal that TEJEDA does not like to deal directly with SAMANIEGO's customers. After the buy, CW-7 was again searched for the presence of drugs and money with negative results, aside from the aforementioned cocaine.

### C. COURT AUTHORITY TO INTERCEPT WIRE COMMUNICATIONS

54.     On August 12, 2004, Chief Judge Charles P. Kocoras of the Northern District of Illinois entered an order authorizing the interception of wire communications occurring to and from the cellular telephone bearing the number (630) 205-8926 (**Target Phone**), used by SAUL TEJEDA, aka "ESKIMO," and subscribed to ADRIANNE POTOCHNEY, girlfriend to TEJEDA.[16] The phone number was billed to TEJEDA's residence, 1000 Superior Street, Aurora, Illinois. Interception pursuant to this order concluded on September 10, 2004.

55.     On September 13, 2004, Chief Judge Charles P. Kocoras entered an order authorizing the continued interception of wire communications over **Target Phone**. This extension authorized the interception of wire communications until October 12, 2004, when the interception pursuant to this order ended.

56.     During the course of the court-authorized interceptions described above, over 6,000 interceptions were monitored and recorded. Affiant, monitoring agents, officers, and other investigators became aware of certain slang terms and code words that were frequently used by the interceptees. Agents learned the meaning of these terms with the help of confidential informants, surveillances and contact with other gang and drug investigators. The following is a list of some of these terms and their meanings, and is not meant to include all of the slang terms or code words used

---

[16] During the paragraphs of this affidavit that refer to incoming and outgoing calls to and from TEJEDA, all such calls, unless otherwise noted, occurred over **Target Phone**.

by the persons intercepted:[17]

8-ball - 1/8 ounce of cocaine

Ball – one ounce of cocaine

Brother - member of the same gang

I/he/she Broke – left the area in a hurry

Cheese, Cheddar - U.S. currency,

Come Through - come over to facilitate drug transaction

Cool – have drugs available to sell

Crib - house, residence

Custy - customer

Dead - no drugs for resale

Flake - rival gang member

Fronted - given drugs in lieu of future payment

Funds - U.S. currency

Girl or Female - gun

Green – marijuana or cash

Hit me up - call me

Holler - call or talk to someone or engage in a drug transaction

Hot – law enforcement in the area

Itchy - gun

---

[17] CW-6 has confirmed the meaning of these terms and that these terms are commonly used among the individuals listed in this complaint.

*Mitad* - Spanish word for half, usually describes a half-ounce of cocaine

No Good - do not have drugs for resale

Neutron - person with no gang affiliation

O - ounce of cocaine

Onion - ounce of cocaine

Paper - U.S. currency

*Pelota* - Spanish word for ball, usually refers to an ounce of cocaine

Pool or Play Pool - referring to 1/8 ounce of cocaine

Popped something off – sold drugs

Ready - do you have money or drugs and are you ready to exchange

Six or Six Pack - 1/16 ounce of cocaine

Split - half of a standard measure of cocaine

Straight - have drugs for resale

White - cocaine

Whole - full standard measure of cocaine

Working or work - have drugs for resale, selling drugs

57.     Few of the persons intercepted during the course of the court-authorized wire interception subscribed to the phone(s) they used, although on occasion, knowledge of the subscriber of record was helpful in determining the user of the phone. Most often, however, the CWs involved in this investigation assisted investigators in determining who used which phones, and surveillances following intercepted phone calls, as well as public documents (such as parole records) helped agents determine the identity of each caller. In addition, agents learned several phone users' identities when

25

（省略）

conspirators sometimes asked for one another's phone numbers. Finally, most of the interceptees identified themselves on the phone at various times during the wire interceptions, thereby allowing agents to tie their names and voices to particular telephone numbers.[18]

## II.   ANALYSIS OF INTERCEPTED CONVERSATIONS

58.   Court-authorized Title III monitoring of the phone calls of SAUL TEJEDA began on August 12, 2004 and continued until October 12, 2004, with the exception of a two-day period on September 11th and 12th. Affiant has reviewed the intercepted telephone conversations and, working with other agents and law enforcement officers, analyzed pen register and telephone activity records. Conversations intercepted over TEJEDA's phone show TEJEDA to be a high volume, multi-kilogram cocaine trafficker. Many of these conversations relate to the distribution of wholesale quantities of powder cocaine, as well as the collection, counting, storage and laundering of the cash proceeds of the drug trafficking activities. Many of these conversations also discuss the use and attempted use of violence against rival gang members, as well as the shootings that were directed at TEJEDA. My understanding and interpretations of these conversations are based on my knowledge of the investigation to date, the context of the conversations (both standing alone and in reference to prior and subsequent conversations), my training and experience, conversations I have had with other officers and agents experienced in narcotics and gang investigations, and on information provided by cooperating witnesses throughout the course of the investigation. Generally, my interpretation of each conversation follows the summary of it.

59.   Times given for intercepted communications summarized below are approximations. These

---

[18] Some interceptees remain unknown, including some involved in distributing cocaine. These unknown interceptees continue to be investigated.

summaries do not include references to every topic discussed during an intercepted conversation, nor do the summaries include every statement made by a speaker about the topics discussed. Moreover, some of the intercepted conversations were in Spanish, and were translated by a certified Spanish translator.

### A.    JUAN MANUEL ALVIAR, aka "MANNY", aka "MUSTY"

60.    Aurora Police Department records, as well as consensual body recordings and seized documents from another federal investigation, reveal that JUAN ALVIAR is currently the Enforcer for the LATIN KINGS. These items reveal that as Enforcer, ALVIAR is responsible for retaliatory acts of violence against rival gangs, administering discipline within the gang, the storage and purchase of weapons for the gang, and consultations with the highest-ranking leaders of the gang, who are known as the "Inca" and "Casique." These consultations involve acts of violence and the protection of fellow Latin Kings selling cocaine. NCIC records indicate that ALVIAR is a convicted felon.

61.    CW-6 said s/he knows ALVIAR and first witnessed ALVIAR buy cocaine from TEJEDA sometime around the summer of 2003. CW-6 stated that s/he has witnessed ALVIAR buy between 4.5 and 9 ounces of cocaine at a time, and stated that ALVIAR bought cocaine from TEJEDA 1-2 times each week. CW-6 last witnessed ALVIAR buy cocaine from TEJEDA in early 2004. CW-6 knows TEJEDA to front cocaine to ALVIAR. CW-6 described an occasion in which TEJEDA went to the "henhouse" (a hangout on Indian Street in Aurora) and "fronted" ALVIAR an ounce of cocaine, and ALVIAR paid TEJEDA for the cocaine two days later. In addition, CW-6 knows ALVIAR to resell cocaine that he buys from TEJEDA, as s/he has overheard ALVIAR and TEJEDA arguing about money ALVIAR owed TEJEDA that was not yet available because ALVIAR's

customers had not yet paid him.

62. Finally, CW-6 has seen ALVIAR carry various types of guns on many occasions. On January 29, 2005, CW6 was outfitted with a body-recording device and entered ALVIAR's then-residence at 749 Front Street, Aurora, Illinois. Once there, as captured on the recording, ALVIAR told Individual A to "give me my itchy." CW-6 then observed Individual A give ALVIAR a black semi-automatic handgun.[19]

## 1. ALVIAR Assists TEJEDA in Distributing Cocaine

63. On August 23, 2004, at approximately 6:07 p.m. (call# 2133), ALVIAR received an incoming telephone call from TEJEDA.[20] TEJEDA asked ALVIAR to come pick him up at his cousin's residence on Grove and Woodruff. Surveilling agents then photographed ALVIAR arrive in a tan Cadillac in front of 829 Grove Street, where TEJEDA then entered the rear driver's side of the car.[21]

64. Later that evening, at approximately 8:10 p.m, agents photographed TEJEDA driving the

---

[19] Agents know ALVIAR to have resided at 749 Front Street on January 29, 2005 because prior to entering this residence, TEJEDA referred to this address during the consensual recording as ALVIAR's "crib." In addition, sometime at the end of January, 2005, the fellow parent of CW-6's child, whom CW-6 is close to, described that residence as ALVIAR's apartment. The fellow parent knows this because s/he is dating ALVIAR's former roommate, whom he resided with at 749 Front Street.

[20] ALVIAR's voice was identified, among other ways, on August 30, 2004, at approximately 7:04 p.m., when he called TEJEDA from the SLEEP INN MOTEL, telephone number (630) 305-6620. ALVIAR asked to meet with TEJEDA, and told TEJEDA he was in room 117. Affiant later went to the Sleep Inn Motel and asked who stayed in Room 117 on the relevant date. Employees of the hotel advised that JUAN ALVIAR had checked into that room, smelling of marijuana.

[21] Agents knew what ALVIAR looked like from having previously viewed an APD booking photo of him.

aforementioned Cadillac with ALVIAR in the front passenger seat. TEJEDA then exited the Cadillac and entered the passenger side of a white Oldsmobile. Inside the Oldsmobile was a woman agents later discovered to be defendant CAROL BANKS, one of TEJEDA's cocaine customers, as outlined in Section S, *infra*.

65.     Based on this investigation and my experience, and the experience of other law enforcement agents, this call and these subsequent surveillances reflect that ALVIAR allowed TEJEDA to drive his vehicle, and thereby assisted in disguising TEJEDA while TEJEDA delivered cocaine to BANKS. CW-2 and CW-6 have confirmed that TEJEDA has others drive him around so that he does not have to drive his own cars, and can therefore more easily avoid detection.

66.     On February 11, 2005, CW-6 conducted a consensually recorded conversation with TEJEDA and ALVIAR. While in the car with CW-6 and TEJEDA, ALVIAR described himself as "just a drug pusher," and claimed that he doesn't "deliver," if "they" want it, "they" have to come to him. ALVIAR then instructed TEJEDA and CW-6 to drive him to the residence at 700 Lafayette/383 Evans, a residence TEJEDA had earlier identified as ALVIAR's mom's house. ALVIAR and TEJEDA then began to argue about prices, and TEJEDA asked ALVIAR, "Is that how you are going to act when I hook you up?" TEJEDA added, "You act like you can't get more tomorrow." TEJEDA then told ALVIAR that he wanted a whole ounce, a half ounce, and two quarters, and said that ALVIAR would get his "cheese right now," because he (TEJEDA) was going to "go sell these motherfuckers right now." ALVIAR exited the vehicle and told CW-6 and TEJEDA to circle the block.

67.     While driving around, TEJEDA complained that ALVIAR charged more than TEJEDA would charge. A couple of minutes later, ALVIAR contacted TEJEDA via direct connect and

requested that he return to pick him up. Once ALVIAR got back in the car, he gave TEJEDA what CW-6 believed to be two quarter ounces of cocaine, one half ounce of cocaine, and one full ounce of cocaine. ALVIAR noted that he "didn't tie up" the half ounce. ALVIAR then drove around with TEJEDA and CW-6 until TEJEDA had sold all of the cocaine, at which time TEJEDA paid ALVIAR for the drugs. During this time, ALVIAR discussed having given TEJEDA a "stack" the day before, and the two discussed an individual who owed TEJEDA money, had "pure shit," and was making money. TEJEDA then asked ALVIAR, "How come when I get some I don't tax you?" ALVIAR then asked TEJEDA if he was interested in getting a dope spot together. TEJEDA said that he wanted his own spot. When ALVIAR got out of the car, he gave TEJEDA what CW-6 explained was the LATIN KING salutation "Corona," which translates from Spanish into "crown."

### 2. Calls Surrounding the Shooting of TEJEDA's Residence by Rival Gang Members

68.     On September 2, 2004, at approximately 8:19 p.m. (call# 3529), ALVIAR placed an outgoing telephone call to TEJEDA. Before TEJEDA picked up the telephone, ALVIAR was telling someone in the background, "I don't want no holes in my shit." When TEJEDA answered the telephone, ALVIAR advised, "Them boys is around there, that nigga in the red Grand AM is on it, bro." ALVIAR then told TEJEDA that although he had been forced to put his vehicle in reverse and get out of the area, he had seen the license plate of the red Grand AM. ALVIAR stated further that he was going back to his residence to switch cars.

69.     Based on this investigation and my experience, and the experience of other law enforcement agents, in this call ALVIAR reported that he had spotted rival gang members in the neighborhood and believed them to be armed. ALVIAR warned TEJEDA that they were near TEJEDA's residence.

30

ALVIAR then said he was switching cars so that he would be in one in which he was not easily identifiable, and so that he could get close to the rival gang members. Subsequent court-authorized wire interceptions revealed that the red Grand AM was the vehicle used to shoot at TEJEDA's residence, as outlined below.

70.    As mentioned earlier, on September 23, 2004, and again on October 9, 2004, shots were fired into TEJEDA's residence. Intercepted calls following these shootings discussed the taking of retaliatory action against a rival gang, the AMBROSE Street Gang, for these two shootings of TEJEDA's home. Since these shootings, surveilling agents have observed visible bullet holes on the east side and in the west door of TEJEDA's residence.

71.    On September 23, 2004, shortly before 5:09 p.m., surveilling agents heard gunshots fired near TEJEDA's residence after observing TEJEDA exit the side door. Agents monitoring intercepted calls then heard ALVIAR receive an incoming telephone call from TEJEDA (call# 7170). TEJEDA began to tell ALVIAR that he just saw "these guys take a right..." when ALVIAR cut him off and said, "We are right behind them."

72.    Approximately one minute later, at around 5:10 p.m. (call# 7173), ALVIAR again called TEJEDA. Although the call was not completed because TEJEDA did not answer it, an unknown male in the background was heard saying, "Ain't no joke bro, they gunning and shit and they still riding low." ALVIAR then asked, "They take a left or they go straight? ...Reverse out, hurry up!"

73.    Based on this investigation and my experience, and the experience of other law enforcement agents, in this call ALVIAR and the unknown male were pursuing the people they believed responsible for shooting into TEJEDA's residence.

74.    A short while later, at approximately 6:28 p.m., ADRIANNE POTOCHNEY placed an

31

outgoing telephone call to TEJEDA.[22] POTOCHNEY immediately asked TEJEDA, "You know that thing that was on the counter? Did you grab that?" When TEJEDA told her he did, she then asked, "Did you clean it?" TEJEDA told her, "I don't know, I'm gonna ask dude right now." She told him, "Ask him, 'cause I picked it up."

75.     Based on this investigation and my experience, and the experience of other law enforcement agents, in this call ADRIANNE POTOCHNEY wanted to ensure a gun that was on the counter at her and TEJEDA's residence would be cleaned, as she had picked it up and did not want her fingerprints to be found. TEJEDA's response reflected that he had already given the gun to someone and promised to makes sure the gun was cleaned.

76.     The following calls occurred subsequent to the second shooting incident at TEJEDA's residence on October 9, 2004:

77.     On October 9, 2004, at approximately 1:55 p.m., (call# 9660) ALVIAR placed an outgoing telephone call to TEJEDA. TEJEDA explained, "Them same niggas came through again." ALVIAR asked, "They went on some crazy shit again?" ALVIAR then asked, "Don't you have this nigga's girlfriend with you?" TEJEDA stated that he had just "put it up" and was getting ready to leave his residence. ALVIAR said that he was on his way to the east side of Aurora to pick up Individual E.[23] ALVIAR, on another telephone in the background, using a push to talk feature, advised someone to go pick up ESKIMO (TEJEDA), and stated further, "These bitch ass niggas just got into it with him." ALVIAR explained that he was presently at Individual F's "new spot" on the west side. APD records and documents recovered as a result of search warrants executed in another federal investigation

---

[22]  ADRIANNE POTOCHNEY's voice identification is described in footnote 62.

[23]  APD has identified Individual E to be a LATIN KING.

32

indicate that Individual F is the Casique, or second in command, for the LATIN KINGS.

78.    Based on this investigation and my experience, and the experience of other law enforcement agents, TEJEDA reported to ALVIAR that his house had been shot at again, and ALVIAR began to organize other members of the LATIN KINGS to take retaliatory action. The reference to "this nigga's girlfriend" was most likely a reference to a gun previously supplied to TEJEDA by ALVIAR, as TEJEDA's use of the impersonal pronoun "it" makes it unlikely that TEJEDA was referring to a "girlfriend." Furthermore, TEJEDA's statement that he had just "put it up" meant that he had just hidden it in a secure place in his house, as he is a convicted felon and not allowed to own firearms.

79.    Approximately ten minutes later, at 2:05 p.m. (call# 9664), ALVIAR placed an outgoing telephone call to TEJEDA. Before TEJEDA answered the telephone, someone in the background was heard saying, "They gonna get their ass whooped." ALVIAR instructed TEJEDA to go to Individual F's new residence on the west side, and told TEJEDA to bring "that female with you too." TEJEDA responded that he could not get to "it," and ALVIAR stated that he had a female who wanted to "holler" at TEJEDA.

80.    Based on this investigation and my experience, and the experience of other law enforcement agents, in this call ALVIAR instructed TEJEDA to go to the Casique's house, and told him that he should bring his gun with him. When TEJEDA responded that he could not get to his gun ("it"), ALVIAR agreed to supply a gun to TEJEDA (ALVIAR had a female who wanted to "holler at TEJEDA"). In sum, the gang was organizing retaliatory action against the persons who shot at TEJEDA's house. It should be noted that at this time the Aurora Police Department had again surrounded TEJEDA's residence while they were conducting their shooting investigation, thus forcing TEJEDA to relocate.

81.     Based on these calls, surveilling agents went to Individual F's residence at 506 Woodlawn
Ave. in Aurora.[24]  Agents photographed TEJEDA, ALVIAR, Individual F, and other identifiable
LATIN KINGS meeting.

82.     On October 9, 2004, at approximately 6:17 p.m. (call# 9738), ALVIAR received an incoming
telephone call from TEJEDA. ALVIAR stated, "That nigga was trying to pull it." TEJEDA asked,
"Who?" ALVIAR responded, "Man you know, same old fuckers.  They in black ah blue Grand
National right now, fool." TEJEDA asked, "An older one or a new one?" ALVIAR then stated that
"they" were near a local gas station, and that "they" tried to "put it on my little nigga," Individual I.
TEJEDA stated that he was on his way to the gas station. ALVIAR told TEJEDA to stay "around
the perimeter" and TEJEDA would see a greenish, grayish Intrepid.

83.     Based on this investigation and my experience, and the experience of other law enforcement
agents, in this call ALVIAR was describing how rival gang members had threatened or shot at
another LATIN KING gang member ("my little nigga"), referred to by nickname (Individual I).
During this call, the LATIN KINGS were hunting for the persons they believed responsible for
shooting into TEJEDA's house.

84.     On October 9, 2004, at approximately 7:44 p.m. (call# 9769), ALVIAR received an incoming
telephone call from TEJEDA.  Prior to the call going through, an unknown male in the background
was heard saying, "That brother had 16 shots." When ALVIAR picked up the telephone, TEJEDA
asked ALVIAR if he was coming to the east side of Aurora. ALVIAR stated that he was, and told
TEJEDA, "Make sure you got your girl with you." TEJEDA responded, "I already got it with me."

---

[24]  As the result of another federal investigation, the residence at this address is known by agents
to belong to Individual F

85.     Based on this investigation and my experience, and the experience of other law enforcement agents, TEJEDA and ALVIAR were planning retaliatory action against the people who had shot at TEJEDA's residence. ALVIAR wanted TEJEDA to have a gun ("Make sure you got your girl with you"), and TEJEDA confirmed that he had a gun with him.

86.     On October 10, 2004, at approximately 12:01 a.m., JESUS RENTERIA placed an outgoing telephone call to TEJEDA. RENTERIA told TEJEDA, "Them flakes is right here." TEJEDA asked, "Where is he at?" RENTERIA replied, "He is right here on Fourth Street. Devious...his plate says Devious on it...Yeah, that's him nigga, he peeped me out right now nigga, I broke." TEJEDA asked, "He's driving right now?" RENTERIA said, "Yeah nigga, he's driving nigga. Get your ass out here dude! I'm gonna drop by your crib right now." TEJEDA replied, "Hurray up man!"

87.     Approximately twenty minutes later TEJEDA made an outgoing telephone call (call# 9819) to ALVIAR. ALVIAR answered the telephone by saying, "Ain't no joke son." TEJEDA asked ALVIAR where he was going, and ALVIAR said that he was dropping some people off. TEJEDA told ALVIAR, "Keep an eye out for me...You hear me?" ALVIAR responded, "Yeah, I heard you, don't even trip."

88.     Based on this investigation and my experience, and the experience of other law enforcement agents, in this call JESUS RENTERIA had spotted the person who had shot at TEJEDA hours before. RENTERIA identified the personalized license plate "DEVIOUS," and TEJEDA confirmed that that was indeed the right person. TEJEDA then wanted to know the whereabouts of "Devious," and RENTERIA went to pick up TEJEDA so they could try to retaliate for the earlier incident. After RENTERIA picked up TEJEDA, TEJEDA called ALVIAR for additional protection ("keep an eye out for me"). Agents know from another LATIN KINGS investigation they are involved in

35

that the enforcer of the LATIN KINGS always has weapons and people available to help in a gun fight. ALVIAR reassured TEJEDA that he was there to help ("Don't even trip").

89.     On October 10, 2004, at approximately 1:12 p.m. (call# 9868), ALVIAR placed an outgoing telephone call to TEJEDA. ALVIAR was heard saying in the background, "They are probably by B.B.'s." ALVIAR explained to TEJEDA, "Bitch ass nigger is over here, riding around right now." TEJEDA asked where ALVIAR saw him, and ALVIAR stated, "Right here on Spring."

90.     CW-3 and Aurora Police Department records indicate that "B.B." is a longtime AMBROSE gang member. Based on this investigation and my experience, and the experience of other law enforcement agents, in this call ALVIAR believed that the assailants were at the AMBROSE gang member's residence. In addition, ALVIAR related that he had seen a car on Spring Street in Aurora containing an individual he believed to be involved in the shootings.

### 3.     Evidence of ALVIAR'S Drug Selling

91.     Agents acquired recorded telephone calls made on January 5, 2005 by ALVIAR from the Kane County jail, where he was being held on traffic violations. ALVIAR called (630) 338-6362,[25] ALVIAR'S own cellular telephone number, and spoke with Individual R. During this conversation, it became clear that ALVIAR had given his cellular telephone to Individual R in order for Individual R to sell cocaine to ALVIAR's customers while ALVIAR was incarcerated. Individual R told ALVIAR that the customers were afraid because they were hearing a voice on ALVIAR's phone that they did not recognize, and therefore they did not want to deal with Individual R.

### 4.     ALVIAR'S "Re-bricking" Device and AK-47

92.     On or about February 14, 2005, CW-6 observed ALVIAR with a device used to re-brick

---

[25] Agents had intercepted ALVIAR using this phone number during the wire.

kilograms of cocaine. CW-6 described the device as a heavy metal box with a removable top, a flat square in the bottom, and a big tube. According to CW-6, the device allows ALVIAR to "re-brick," or turn one kilogram into two kilograms. CW-6 related that ALVIAR kept the device behind a curtained doorway, just off the kitchen of his residence on Parkside Avenue. While at the residence with CW-6 and TEJEDA, ALVIAR told TEJEDA that he could stamp kilograms, wrap them, or do whatever was needed. He even offered to use TEJEDA'S Jesus medal to stamp a kilogram.

93.    On this date, CW-6 also observed ALVIAR emerge from his bedroom with an AK-47 assault rifle. ALVIAR joked that if "you're going to be walking around with a "9," you might as well walk around with this, 'cause you're going to catch the same kind of case for it." CW-6 agreed, mentioning that the law had changed. ALVIAR then commented that they could go buy as many of "these" as they wanted. CW-6 said that s/he and ALVIAR were discussing the fact that since the ban on assault weapons had recently been lifted, anyone wanting to carry a 9mm handgun might as well carry an assault rifle, as they would face the same legal penalty. CW-6 then asked to see the bullets in the AK-47, and ALVIAR removed the clip and showed CW-6 that the rifle was loaded.

### B.    JOSE MELERO, aka "PEP-DOG"

94.    Aurora Police Department records indicate that JOSE MELERO, also known as "PEP-DOG," is a LATIN KING and was formerly one of the LATIN KING Enforcers. CW-6 has related that MELERO lives at 227 S. Fifth Street, Aurora, Illinois, and agents have observed him coming and going from there numerous times. NCIC records indicate that MELERO is a convicted felon.

95.    CW-6 related that s/he has seen MELERO with different types of guns on many occasions. CW-6 also knows MELERO to steal cocaine from people whenever he gets the chance, and has been

37

with MELERO and others when they have planned such robberies and have discussed having committed them. For example, CW-6 described one instance in which MELERO and another individual discussed having robbed and beaten someone for a kilo of cocaine sometime in 2001. CW-6 mentioned another incident, during the summer of 2003, when MELERO described to CW-6 kidnapping someone in order to steal more than 100 pounds of marijuana. In addition, TEJEDA told CW-6 about an incident in November of 2004, when defendants APOLINAR DELGADO-RIOS and MIGUEL RIOS told TEJEDA where multiple kilos of cocaine were being stored in a garage. Defendants TEJEDA, MELERO, and MADRIGAL then broke into the garage and stole 4 kilos of cocaine, and each, along with both APOLINAR DELGADO-RIOS and MIGUEL RIOS, received 3/4 of a kilo as their cut.

96.     CW-6 has related that in October of 2004, s/he observed MELERO with a gun and approximately four-and-a-half ounces of cocaine in MELERO's bedroom at 227 South 5th Street.[26] While at MELERO's residence, MELERO tried to sell CW-6 an ounce of the cocaine for $675. CW-6 also related that on February 10, 2005, CW-6 was outfitted with a body-recording device that recorded his/her conversations. On this date, CW-6 was with TEJEDA at MELERO's residence on South 5th Street and observed MELERO with a .357 caliber firearm  inside his residence. [27] MELERO also gave a small child in the home the revolver, and joked, "Here, go do security. Go

---

[26]  TEJEDA had just been arrested by APD for possessing cocaine.  CW-6 went to MELERO's home to obtain bond money for TEJEDA.

[27]  About a week before this, on January 31, 2005, CW-6 was outfitted with a body-recording device that recorded his/her conversations.  S/he met with TEJEDA and two others, and the four were driving around when TEJEDA observed a car following them.  TEJEDA said, "Let's pick up an itchy."  One of the other individuals said, "The .357 is right there," and pointed in the direction of MELERO's house, which CW-6 confirmed was just down the street from them.

boom-boom." CW-6 also saw on this date LATIN KING indicia in MELERO's bedroom, specifically, a rug depicting a lion on the wall, and a "Corona" poster, which did not relate to the beer, but to the LATIN KINGS, as it was in black and gold. CW-6 knows the lion to be a LATIN KING symbol, and "Corona" to be a LATIN KING salutation.

97.     CW-6 said s/he first witnessed MELERO buy cocaine from TEJEDA in approximately 2001. CW-6 said s/he has witnessed MELERO buy from .5 to 4.5 ounces of cocaine at a time, and stated that he will buy cocaine from TEJEDA 1 - 2 times each week. CW-6 last witnessed MELERO buy cocaine from TEJEDA during the spring of 2004. CW-6 has also witnessed TEJEDA front cocaine to MELERO, and MELERO in turn resell the cocaine he bought from TEJEDA. In addition, CW-6 has gone with TEJEDA to pick up cocaine that MELERO allowed TEJEDA to store at MELERO's former house.

98.     On September 6, 2004, at approximately 2:38 p.m. (call #4566), MELERO placed an outgoing telephone call to SAUL TEJEDA.[28] MELERO told TEJEDA, "I need to holler at your punk ass real quick." TEJEDA responded that he was about to shower, and MELERO replied, "Why don't you come through real quick before you take a shower...come on...believe me, it's worth coming out son, I gotta holler at you real quick." TEJEDA told MELERO he would be there in fifteen minutes. At approximately 3:23 p.m., MELERO again called TEJEDA. MELERO asked, "What's up, son? Where you at?" TEJEDA replied that he was near Illinois Street and told

---

[28] JOSE MELERO's voice was identified, among other ways, through his regular use of a phone subscribed to an individual APD records identify as his mother. MELERO used this phone during call #4593 on September 6, 2004, a call in which TEJEDA indicated he was on his way to meet MELERO. Minutes later, surveilling agents observed MELERO (whom they recognized from having viewed a booking photo of him) and TEJEDA meeting at MELERO's residence, 227 S. Fifth Street in Aurora.

MELERO, "I'm gonna head that way right now." A surveilling agent then observed and photographed TEJEDA and MELERO meet that afternoon at 227 South 5th Street, Aurora, Illinois.

99.     Based on this investigation and my experience, and the experience of other law enforcement agents, in this call MELERO wanted TEJEDA to sell him cocaine ("holler"), and he wanted it to be brought to MELERO's residence ("come through"). MELERO had a customer with ready cash or a customer who wanted a relatively larger amount of cocaine ("worth coming out").

100.     On September 10, 2005, at approximately 4:39 p.m. (call #5306), defendant JOSE MELERO placed an outgoing call to TEJEDA and said that somebody told him that "5-0 peeped" TEJEDA's crib. TEJEDA responded that he would check it out, and mentioned that he was with RUDOO, whom CW-6 has identified as defendant RODOLFO MADRIGAL.

101.     Based on this investigation and my experience, and the experience of other law enforcement agents, in this call MELERO warned TEJEDA that law enforcement was watching his house. TEJEDA responded that he would "check it out," meaning drive by.

102.     On September 16, 2004, at approximately 8:31 p.m. (call # 5873), defendant LARRY BOWLES placed an outgoing telephone call to TEJEDA.[29] During the call, TEJEDA mentioned that he was "rolling around" with "'P' and 'Rudoo'"[JOSE MELERO and RODOLFO MADRIGAL].[30] BOWLES asked, "Can I jump in the van or what?" TEJEDA told BOWLES that they were not in the van. TEJEDA responded, "We might jump in with you nigga, you legit." BOWLES replied, "I ain't legit, legit with what?" TEJEDA then stated, "We rolling around dirty

---

[29] LARRY BOWLES's voice identification is described in footnote 50.

[30] CW-6 has advised agents that "P" (a shortened version of "Pep Dog") is a nickname for JOSE MELERO, and "Rudoo" is a nickname for RODOLFO MADRIGAL.

right now." BOWLES stated that he was also "rolling around," and TEJEDA promised to call BOWLES when they got back to the east side of Aurora.

103.     Based on this investigation and my experience, and the experience of other law enforcement agents, in this call TEJEDA, MELERO, and MADRIGAL were driving in a vehicle ("rolling around"). BOWLES assumed they were in MADRIGAL's van and wanted to get in the car with them. TEJEDA said they were not in the van, and that they were driving without a valid license ("I ain't legit") and should get in BOWLES' vehicle. TEJEDA then stated they had cocaine in the vehicle ("we rolling around dirty"). BOWLES and TEJEDA agreed to get together when TEJEDA got back to the east side of Aurora. At or about the time of this call, surveilling agents observed and photographed TEJEDA and MADRIGAL meet with defendant CAROL BANKS at approximately 5:52 p.m.[31]

104.     That same night, at approximately 9:08 p.m. (call# 5882), MELERO, using TEJEDA's telephone, made an outgoing call to an unidentified male. The two discussed where each was located at that time. MELERO stated, "I'm over here hollering at this nigga right now." The unidentified male asked if he had left his keys in MELERO's suburban. MELERO confirmed that he had, and the male said that he wanted to meet with MELERO to get the keys. MELERO told him, "I'm out here with this nigga; you know where I'm at." The unidentified male then replied, "Alright then, I'll be over there." MELERO then asked, "Did you get that gun or what?" The unknown male responded that he had not, but stated that he needed to right away. MELERO told this person to call him when he arrived.

---

[31] Agents had previously identified MADRIGAL through an APD booking photo, and had previously identified BANKS through her driver's license photo.

105. Based on calls intercepted earlier that day between TEJEDA and others, and based on my experience and the experience of other law enforcement agents, MELERO in this call was getting cocaine from TEJEDA ("hollering at this nigga right now"). The unidentified male had left his car keys in MELERO's suburban and needed to get them. MELERO then asked the unidentified male whether he had picked up his gun ("Did you get that gun or what").

106. On September 23, 2004, at approximately 10:28 p.m. (call # 7298), TEJEDA received an incoming telephone call from JOSE MELERO. MELERO asked to speak with MAGIC.[32] TEJEDA responded that MAGIC was sleeping and MELERO told TEJEDA that MAGIC left "us" stranded, and that MAGIC had the "didgi" (phonetic). MELERO further advised, "we can't do shit out here now," and claimed that MAGIC had "fucked the whole demo up." TEJEDA gave MAGIC the telephone, and MELERO berated MAGIC for taking the "didgi" with him, and instructed MAGIC to bring the "didgi "out here."[33] MADRIGAL tried to calm MELERO down, and said that he could not go out there right now, which made MELERO even angrier. MELERO restated, "We can't do nothing...Ain't nothing happening without that." MADRIGAL refused to take the "didgi" to MELERO and said, "Forget the skizzy man." MELERO said, "You got everything else too in the van we need." MADRIGAL then claimed, "I'm on my way." MELERO indicated that he did not believe MADRIGAL, and the telephone was passed back to TEJEDA. MELERO tried to convince TEJEDA to bring MADRIGAL and the van out to him. TEJEDA stated, "I ain't going out there." TEJEDA explained that his house was shot up earlier in the day by "DEVIOUS." MELERO replied, "Why don't you come out here nigga, we'll go out there in the morning, I gotta go out there

---

[32] APD records indicate that MADRIGAL goes by the nickname "MAGIC."

[33] MADRIGAL's voice identification is described in footnote 59.

anyways." TEJEDA refused.

107.     Based on this investigation and my experience, and the experience of other law enforcement agents, "didgi" and "skizzy" are code words for a digital scale, which drug traffickers frequently use to divide larger amounts of drugs into smaller amounts for resale. Additionally, the reference to the "demo" was a reference to a drug operation. MELERO in this call was advising TEJEDA and MADRIGAL that he had cocaine to subdivide and needed the digital scale ("didgi," "skizzy") and other supplies in order to divide it accurately. These items were in MADRIGAL's van ("You got everything else too in the van we need"). At the end of the call, TEJEDA mentioned to MELERO that "DEVIOUS" had shot at his house. MELERO used this fact to try to encourage TEJEDA to bring the scale out by offering to go out with TEJEDA and retaliate against DEVIOUS the following morning ("Why don't you come out here nigga, we'll go out there in the morning, I gotta go out there anyways"). Public records, APD records, and CW-3 have stated that DEVIOUS lives in Oswego ("out there").

108.     On September 30, 2004, at approximately 6:39 p.m. (call# 8427), MELERO placed an outgoing telephone call to **Target Phone**, and spoke to MADRIGAL. MELERO told MADRIGAL, "You know with those things I got out here...I need y'all to take one to my boy...You know what I'm talking about." MADRIGAL agreed and then gave the telephone to TEJEDA. MELERO asked TEJEDA, "Remember my boy over there on the west side where I be going to...he wants some, can you go by right now and holler at him or what?" TEJEDA agreed.

109.     On the same date, at approximately 7:14 p.m. (call# 8435), TEJEDA received another telephone call from MELERO. MELERO asked TEJEDA if TEJEDA had "hollered at dude yet." TEJEDA responded that he had not, but said he was on his way. MELERO stated that he just had

43

a call from "dude" who was wondering how long it would be, and stated that he told "dude" to wait a "couple of minutes." TEJEDA verified that "dude" was on the west side of Aurora.

110.     Based on this investigation and my experience, and the experience of other law enforcement agents, in this call MELERO was asking TEJEDA to sell cocaine ("holler") to one of MELERO's drug customers. The customer ("dude") had contacted MELERO and asked how long it would be before the drugs arrived.

111.     On the same date, at approximately 7:38 p.m., (call# 8443) MELERO again placed an outgoing telephone call to TEJEDA. TEJEDA stated that he was at the corner of Florida and Highland Avenues on the west side of Aurora. MELERO directed TEJEDA to go "in the back" because the guy was still waiting and was probably outside.

112.     Based on this investigation and my experience, and the experience of other law enforcement agents, in this call MELERO directed TEJEDA to the drug customer who was waiting to buy cocaine.

113.     As described, during the course of the court authorized wire interceptions, and specifically on September 23, 2004 and October 9, 2004, TEJEDA was shot at on two occasions, and it is believed that several members of the Latin Kings, of which both TEJEDA and MELERO are members, were arming themselves as a result of the gang violence. On October 6, 2004, at approximately 4:00 p.m., MELERO placed an outgoing telephone call to TEJEDA. MELERO was talking to someone in the background about smoking a "joint," and when TEJEDA picked up the telephone, MELERO told TEJEDA he would like to borrow TEJEDA's "girl." MELERO said he was about to leave, and that he would like TEJEDA to be ready with "it." TEJEDA responded that he was on the road, and MELERO replied that he was "straight" and didn't need "it" immediately.

TEJEDA told MELERO that MELERO should call later if he needed "it."

114.     Based on this investigation and my experience, and the experience of other law enforcement agents, the item being discussed in this call is a firearm. It is common gang slang to refer to a firearm with various nicknames, one of which is a girl or woman. The fact that a girl is requested, and then later referred to by both individuals with the impersonal pronoun "it," indicates that they are talking about an object and not a person.

## C.    JESUS RENTERIA, aka "EL APA" aka "JESSE"

115.     As reveled by intercepted calls, JESUS RENTERIA is a close associate of SAUL TEJEDA. During this investigation, numerous surveilling agents have observed defendants RENTERIA and TEJEDA together, often in RENTERIA's car,[34] while TEJEDA delivered cocaine to his customers (as reflected in intercepted calls).

116.     CW-6 knows RENTERIA and that he started dealing with TEJEDA in approximately 2004. CW-6 believes that TEJEDA and RENTERIA are cousins. CW-6 witnessed RENTERIA start buying cocaine from TEJEDA in approximately the early fall or late summer of 2004. CW-6 said that RENTERIA buys from .5 to 4.5 ounces of cocaine at a time from TEJEDA, and will buy cocaine from TEJEDA approximately 1 time each week. CW-6 last knows RENTERIA to have bought from TEJEDA in November of 2004. CW-6 knows TEJEDA to front cocaine to RENTERIA because s/he has heard TEJEDA complain about RENTERIA taking too long to pay him back. CW-6 has heard RENTERIA and TEJEDA discuss that RENTERIA resells the cocaine that he bought from TEJEDA.

---

[34] RENTERIA drove a midnight-blue Chrysler sedan, which surveilling agents have observed him in. CW-6 has identified this car as belonging to RENTERIA, and Secretary of State records indicate the car is registered to an individual CW-6 and APD records have identified as RENTERIA's mother. CW-6 related that RENTERIA crashed the car in November, however, and does not believe that RENTERIA currently drives it.

117.    CW-6 has also gone with TEJEDA several times to pick up cocaine that RENTERIA allowed TEJEDA to store at his (RENTERIA's) house at 1437 Fairway Drive.[35]  For example, on or about January 1, 2005, while outfitted with a body-recording device that recorded the ensuing conversations, CW-6 rode with Tejeda and RENTERIA's brother, Individual F, to 1437 Fairway Drive. When they arrived there, Individual F went inside.  A short time later Individual F returned to the car and threw a package into Tejeda's lap.  Individual F then advised Tejeda that he needed to take "it" out of there because the apartment "was burned up."  CW-6 observed the package and believed it to be a plastic baggie containing cocaine.

118.    On or about February 25, 2005, CW-6 was outfitted with a body-recording device that recorded conversations s/he had with TEJEDA and others.  CW-6 picked TEJEDA up from his Village Green Drive apartment and drove him to deliver cocaine to two customers.  The two then drove to defendant JESUS RENTERIA's apartment on 1437 Fairway Drive, Apartment 102, where CW-6 observed TEJEDA advise Individual F to "go bag something up."  Individual F then went to a back bedroom of 1437 Fairway Drive, and returned a short while later and handed TEJEDA a plastic bag which contained several smaller packages containing a white substance that CW-6 believed was cocaine.  CW-6 then observed RENTERIA pay TEJEDA $500 cash, which CW-6 believed to be from a previously-fronted cocaine transaction.

119.    On August 27, 2004, at approximately 10:37 a.m., defendant HERIVERTO RIOS made

---

[35]  Agents know this to be RENTERIA's residence because CW-6 has told them so.  In addition, on October 3, 2004, agents conducted a surveillance of the address.  They observed two cars in the driveway, each registered to a woman CW-3 and public records have identified as RENTERIA's mother.  On that date, agents also observed JESUS RENTERIA come out from a door to the house, retrieve cleaning supplies from one of the cars, and clean the other.  Agents recognized RENTERIA from a booking photograph they had previously obtained from APD. After cleaning one of the cars, RENTERIA got inside of it and drove away.

an outgoing telephone call to SAUL TEJEDA.[36]  RIOS asked, "You didn't hear about yesterday?" TEJEDA said that he had not.  RIOS explained, "I was with EL APA [JESUS RENTERIA][37]...I was at my baby's mom's aunt's house on New York Street, I was gonna give [Individual J] and EL APA a ride home...EL APA is packing in my car...that dude that lives upstairs...he had just got home from work and he got mad cause his lady was outside with us...he tricked off on us on the police and the police got behind me...the car wasn't even on yet...this nigga ran cause he was packing...[Individual J] ran and then I ran...they didn't catch me bro, they didn't catch none of us...but the thing is they towed my car."  TEJEDA asked "Did you report it stolen?"  RIOS admitted that he had not thought to.  TEJEDA then told RIOS he should have.  RIOS asked, "Can I still do it or what?"  TEJEDA replied, "Just report it stolen and say you don't know who took it...just be like, man, I woke up and my car is missing...just report it stolen."  RIOS answered, "I'm gonna do that right now."

120.      Based on this investigation and my experience, and the experience of other law enforcement agents, in this call RIOS explained to TEJEDA an incident in which RENTERIA had a gun on his person ("packing").  The Aurora Police arrived before they were able to start the car, and everyone ran and escaped.  TEJEDA was assisting RIOS in evading law enforcement detection by suggesting he pretend his car had been stolen from him before police arrived at the scene and observed it.

121.      On August 27, 2004, at approximately 5:49 p.m. (Call# 2765), JESUS RENTERIA

---

[36]  RIOS's voice identification is described in footnote 55.

[37]  CW-6 has confirmed that "EL APA" is JESUS RENTERIA.

received an incoming telephone call from SAUL TEJEDA.[38] RENTERIA told TEJEDA, "They told me they think it was that dude that called 5-0...did BETO [HERIVERTO RIOS][39] tell you what happened?" TEJEDA told him that defendant HERIVERTO RIOS, aka BETO, had already told the story. RENTERIA explained, "I had to break...BETO knocked that lady on her ass...BETO knocked that police officer on her ass...he slammed her...on the floor...he body slammed that female on her back...cause I ran out the car...I broke from the car...Old girl had him by the shirt...he picked her up and slammed her hard as hell."

122.     Based on this investigation and my experience, and the experience of other law enforcement agents, in this call RENTERIA explained to TEJEDA how he had been forced to run from the police because he (RENTERIA) had a gun ("I broke from the car" and "EL APA is packing in my car" from the call described earlier) and how HERIVERTO RIOS, aka BETO, knocked down a female Aurora Police Officer in order to escape. Agents have confirmed that on this date, a female APD officer was body-slammed by a man who fled.

123.     On August 27, 2004, at approximately 7:29 p.m. (Call# 2811), JESUS RENTERIA placed an outgoing telephone call to TEJEDA. RENTERIA asked if TEJEDA remembered "that guy" in the "little red car." TEJEDA asked if RENTERIA meant Individual K. RENTERIA said yes, and stated that Individual K lived around Oswego. TEJEDA told RENTERIA he would talk to RENTERIA about the matter later.

---

[38] JESUS RENTERIA's voice was identified, among other ways, on October 8, 2004 (call#9622), when defendant CRUZ SAMANIEGO called Target Phone and asked for the number of "EL APA." The phone umber ADRIANNE POTOCHNEY provided, (630) 299-9617, was the phone number RENTERIA frequently used to call **Target Phone**.

[39] CW-2, CW-3, CW-6, and APD records confirm BETO is defendant HERIVERTO RIOS.

48

124.     Based on this investigation and my experience, the experience of other law enforcement agents, source information, and court authorized wire interceptions, this call reflects that even before TEJEDA's house was shot, TEJEDA and his co-conspirators were conscious of Individual K, a.k.a. DEVIOUS, being a threat. Accordingly, RENTERIA advised TEJEDA where Individual K lived.

125.     On September 2, 2004, at approximately 8:45 p.m. (Call# 3848), JESUS RENTERIA placed an outgoing telephone call to TEJEDA. RENTERIA told TEJEDA that TEJEDA forgot "the bag." TEJEDA told RENTERIA that he was aware of that, and instructed RENTERIA to "put it away."

126.     Based on this investigation and my experience, and the experience of other law enforcement agents, in this call RENTERIA advised TEJEDA that he had forgotten either a firearm or a quantity of drugs. TEJEDA acknowledged this and told RENTERIA to "Put it away."

127.     On September 8, 2004, at approximately 6:15 p.m., defendant CARLOS ESCALANTE[40] made an outgoing telephone call to TEJEDA. ESCALANTE asked TEJEDA if he was "Cool or what?" TEJEDA told him yes and then said, "You're disappearing on me and shit." ESCALANTE replied, "Man you fucking took off...I had to fuck with JESSE [RENTERIA][41] and shit."

128.     Based on this investigation and my experience, and the experience of other law enforcement agents, in this call TEJEDA stated that he had not heard from ESCALANTE in a while. ESCALANTE told TEJEDA that TEJEDA was the one who had disappeared, and TEJEDA's unavailability had forced ESCALANTE to buy his cocaine from JESUS RENTERIA ("I had to fuck with JESSE").

---

[40] ESCALANTE's voice is identified in footnote 83.

[41] CW-3 and CW-6 have confirmed that JESSE, aka EL APA, is defendant JESUS RENTERIA.

129.     On October 8, 2004, at approximately 11:12 p.m. (call# 9622), CRUZ SAMANIEGO placed an outgoing telephone call to **Target Phone** and spoke with ADRIANNE POTOCHNEY.[42] SAMANIEGO asked POTOCHNEY, "Can you get the other number? ...EL APA's" [JESUS RENTERIA's]. POTOCHNEY asked, "JESSE's number?" SAMANIEGO replied, "JESSE, yeah." POTOCHNEY then gave the number 299-9617 to SAMANIEGO. A short time later, On October 9, 2004, at approximately 12:01 a.m. (call# 9628), CRUZ SAMANIEGO received an incoming telephone call from TEJEDA. SAMANIEGO told TEJEDA, "I called earlier...I'm already straight." TEJEDA asked, "Who'd you call? You call JESSE [RENTERIA] up or what?" SAMANIEGO replied, "Yeah...I tried to invite him to the spot." TEJEDA asked, "Did he go over there?" SAMANIEGO replied, "Yeah he did, he tripped a little then took off."

130.     Based on this investigation and my experience, and the experience of other law enforcement agents, POTOCHNEY in this call gave JESUS RENTERIA's phone number to SAMANIEGO. TEJEDA called SAMANIEGO back a short time later and SAMANIEGO told TEJEDA that he had called earlier to buy cocaine, but was able to get it from another source ("I'm already straight"). TEJEDA then asked if he got cocaine from RENTERIA ("JESSE"), and SAMANIEGO confirmed that RENTERIA had come to SAMANIEGO's location ("spot") to deliver cocaine.

131.     As described, on September 23, 2004, and again on October 9, 2004, TEJEDA's residence was the target of gunfire. Affiant believes, based on the intercepted calls summarized previously, that the LATIN KINGS, including TEJEDA, believed the shots were fired by an AMBROSE gang member nicknamed DEVIOUS. According to intercepted calls, DEVIOUS drives

[42] ADRIANNE POTOCHNEY's voice is identified in footnote 62.

a small red Pontiac Grand Am.

132.     On October 4, 2004, at approximately 10:39 p.m. (Call# 9114), RENTERIA placed an outgoing telephone call to TEJEDA. RENTERIA told TEJEDA that "he" went down the street where RENTERIA and TEJEDA had parked earlier in the day. RENTERIA explained that "he" went away on foot. TEJEDA seemed surprised, and repeated "on foot?" RENTERIA verified that "he" was on foot.

133.     Based on this investigation and my experience, and the experience of other law enforcement agents, as well as from earlier and later intercepted calls, RENTERIA was explaining that he had spotted a rival gang member, Individual K, also known as "DEVIOUS," believed to be the person who shot at TEJEDA's house on September 23, 2004. Calls intercepted during this time period reflect that TEJEDA, RENTERIA, and other coconspirators were constantly on the lookout for DEVIOUS and calling one another to discuss sightings of him.

134.     On October 10, 2004, at approximately 1:48 a.m. (Call# 9814), RENTERIA placed an outgoing telephone call to TEJEDA. RENTERIA advised he had spotted DEVIOUS on 4th Street in Aurora, and stated that the license plate on the red car said DEVIOUS. TEJEDA confirmed that the license plate said DEVIOUS. RENTERIA then stated that DEVIOUS had seen RENTERIA, and RENTERIA had left the area in a hurry as a result. RENTERIA then told TEJEDA to come over to the area immediately, and offered to pick up TEJEDA. TEJEDA stated that RENTERIA should hurry up.

135.     Based on this investigation and my experience, and the experience of other law enforcement agents, in this call TEJEDA intended to retaliate against DEVIOUS for shooting TEJEDA's residence, and RENTERIA was assisting TEJEDA in finding and harming DEVIOUS.

51

136.     On October 10, 2004, at approximately 5:40 p.m., (Call# 9935), CAROL BANKS called TEJEDA.[43] TEJEDA directed her to go to the "store," and told her he was eating and would be on his way when he finished. Surveilling agents then observed TEJEDA eating at La Quebrada Mexican restaurant. Approximately 25 minutes later, (Call#9945) TEJEDA told BANKS he was on his way. Shortly thereafter, surveilling agents then observed RENTERIA driving TEJEDA in RENTERIA's blue Chrysler 300M, a sedan, to the Jewel Osco. There, agents photographed BANKS get into the car, remain briefly inside, and return to her car.

137.     Based on this investigation and my experience, and the experience of other law enforcement agents, in these calls BANKS was arranging to meet with TEJEDA to conduct a drug deal. RENTERIA drove TEJEDA so as to help conceal him.

138.     On October 12, 2004, investigators executed a search warrant at 1000 Superior Street, Aurora, Illinois, the residence at the time of SAUL TEJEDA and ADRIANNE POTOCHNEY. Agents did not recover any drugs. At approximately 11:14 p.m. (Call# 10266) on this date, TEJEDA placed an outgoing telephone call to RENTERIA. RENTERIA told TEJEDA that he was on his way to his mother's house and said "I already got the thing, the quarter." At approximately 11:51 p.m. (Call# 10270), TEJEDA made another outgoing telephone call to RENTERIA. RENTERIA asked TEJEDA, "Are you outside?" TEJEDA responded, "In the back".

139.     Based on this investigation and my experience, and the experience of other law enforcement agents, in this call RENTERIA was at his residence holding a quantity of cocaine recovered from TEJEDA's residence before the execution of the search warrant. Agents believe TEJEDA had been tipped off to the impending execution of the search warrant when TEJEDA

---

[43] BANKS's voice identification is described in footnote 89.

52

spotted surveilling agents earlier in the day watching him, as TEJEDA and the surveilling agents made eye contact. I believe that TEJEDA had then instructed someone to remove cocaine from his (TEJEDA's) home and bring it elsewhere. Much later, TEJEDA called RENTERIA to obtain the cocaine.

### D. APOLINAR DELGADO-RIOS, aka "POLO"

140.       As outlined during the ensuing intercepted calls, APOLINAR DELGADO-RIOS is one of TEJEDA's cocaine suppliers.[44] In addition, at least once before meeting with RIOS, TEJEDA told his customers that he was without cocaine, using phrases such as "no good" or responding in the negative when his customers asked him if he was "working" or could "come through." Shortly after meeting with RIOS, TEJEDA resumed trafficking in cocaine.[45]

141.       On September 28, 2004, at approximately 1:39 p.m. (call# 8167), CRUZ SAMANIEGO

---

[44] APOLINAR RIOS's voice was identified, among other ways, on October 8, 2004, when investigators conducted a traffic stop on him shortly after intercepting a call between him and TEJEDA. During this stop, DELGADO-RIOS provided investigators with his name and identification. Investigators also observed RIOS's telephone continue to receive incoming phone calls from **Target Phone** during the stop.

[45] CW-6 is acquainted with APOLINAR DELGADO-RIOS and knows that he started dealing with TEJEDA in approximately 2002. CW-6 knew RIOS to buy cocaine from TEJEDA, and said s/he first witnessed RIOS buy cocaine from TEJEDA in approximately 2003. CW-6 said that RIOS bought from .5 to 2 ounces of cocaine at a time, and generally bought cocaine from TEJEDA 1 - 3 times each week. CW-6 last witnessed RIOS buy cocaine from TEJEDA during the spring of 2004. During this time period, CW-6 witnessed TEJEDA front cocaine to RIOS. CW-6 knew RIOS to resell cocaine that he bought from TEJEDA because s/he has overheard RIOS saying that he has run out of the cocaine he has bought from TEJEDA and that his (RIOS's) customers need more. Although CW-6 has described RIOS as a customer of TEJEDA's and not a supplier, I believe this contradiction is due to the fact that CW-6's knowledge of TEJEDA and RIOS's relationship only extends into early 2004. Based on calls intercepted beginning in August 2004, RIOS had shifted from TEJEDA's buyer to his supplier.

placed an outgoing telephone call to TEJEDA.[46] In the call, SAMANIEGO asked, "What happened?" TEJEDA replied, "I'm still waiting." SAMANIEGO told TEJEDA, "Just hit me up though." Based on this investigation and my experience, and the experience of other law enforcement agents, in the call SAMANIEGO was seeking to buy cocaine from TEJEDA.

142.    On September 28, 2004 at approximately 2:11p.m., surveilling agents observed RIOS leave his residence at 741 Columbia Street[47] and drive to the 800 block of Spring Street in Aurora. RIOS then left that address, and at approximately 3:31 p.m., surveilling agents photographed DELGADO-RIOS park and enter TEJEDA's residence. A short time later, agents photographed numerous individuals enter and exit TEJEDA's residence. At or about the same time these individuals were arriving at TEJEDA's residence, agents intercepted calls from several individuals requesting to visit TEJEDA.

143.    At approximately 8:37 p.m. on this date (call #8228), SAMANIEGO again spoke to TEJEDA. SAMANIEGO asked, "Can I come over?" TEJEDA responded, "Yeah, come through."

144.    Based on this investigation and my experience, and the experience of other law enforcement agents, TEJEDA initially did not have cocaine to sell ("I'm still waiting"). However, TEJEDA's later statement, "come through," reflects that TEJEDA had obtained cocaine from RIOS later that evening, and now had some available to sell to SAMANIEGO.

145.    On August 16, 2004, at approximately 1:49 p.m. (call# 916), RIOS received an incoming telephone call from TEJEDA. The conversation was in Spanish. When RIOS answered the

---

[46] Defendant CRUZ SAMANIEGO's voice identification is described in footnote 79.

[47] Agents conducted a ruse traffic stop on RIOS on October 8, 2004 based on calls intercepted during the wire. During this stop, RIOS said he lived at 741 Columbia Street, in Aurora.

telephone, TEJEDA asked, "What's up asshole?" RIOS responded, "By tomorrow at whatever time you want, I'll go for them... the same. I'll get them in the morning at whatever time you want." TEJEDA responded, "Okay." RIOS said further, "In the morning, at whatever time you call me and the same okay?" RIOS went on, "Everything will be ready in the morning. Call me at my house tomorrow and the same." RIOS then again said, "Okay, then, everything is ready just... everything tomorrow... is ready." TEJEDA said, "Okay." RIOS continued, "Call me at any time." TEJEDA said, "Okay."

146. Based on this investigation and my experience, and the experience of other law enforcement agents, in this call RIOS was bringing in cocaine for TEJEDA and would have the supply ready the next day ("them"). RIOS was talking about a quantity of cocaine when he referred to "them." This was not the first time RIOS had supplied TEJEDA with cocaine ("And the same...okay?").

147. On the same day, August 16, 2004, at approximately 4:09 p.m. (call# 930), RIOS placed an outgoing telephone call to TEJEDA. RIOS stated, "Hey, do you want to come by or do I go over there? It's ready." TEJEDA responded, "I'll go by there shortly." RIOS asked, "Like in how much time?" TEJEDA answered, "Like in five minutes asshole." RIOS said, "Okay, I'll wait for you outside." A few minutes later, at 4:12 p.m., (call# 932) RIOS received an incoming telephone call from TEJEDA. RIOS stated, "I'll be right there." TEJEDA responded, "Okay." At approximately 4:39 p.m. (call# 938), RIOS received an incoming telephone call from TEJEDA. RIOS told TEJEDA that RIOS would "be there in two minutes." TEJEDA then asked, "Are you there yet?" RIOS explained that he was on his way.

148. Based on this investigation and my experience, and the experience of other law

enforcement agents, in these calls RIOS and TEJEDA were arranging the meeting at which RIOS would supply TEJEDA with cocaine.

149.     On August 24, 2004, at approximately 6:08 p.m. (call# 2303), RIOS placed an outgoing telephone call to TEJEDA. RIOS stated, "Hey, it's done. Where do I meet you?" RIOS went on, "I already moved to another location but I will tell you in person." TEJEDA responded, "Okay." RIOS said, "I'm not close right now, but you know, but I'll go over to you to talk, where do I see you so I can take you that?" TEJEDA replied, "I'm over here by my house." RIOS asked, "Where?" TEJEDA answered, "Over here by the house, asshole." RIOS said, "Okay then, well, I'm going over there now, okay then?" TEJEDA said, "Okay." Nearby surveilling agents then observed RIOS arrive at TEJEDA's residence and go inside.

150.     Based on this investigation and my experience, and the experience of other law enforcement agents, RIOS delivered a supply of cocaine to TEJEDA after this call.

151.     On September 8, 2004, at approximately 12:58 p.m. (call# 4792), RIOS received an incoming telephone call from TEJEDA. TEJEDA asked, "What's up?" RIOS responded, "It's done." TEJEDA stated, "Okay, come to my house asshole, I'm here." RIOS responded, "Okay, I'll go over right now."

152.     Based on this investigation and my experience, and the experience of other law enforcement agents, in this call RIOS told TEJEDA that he had received a supply of cocaine ("It's done"). TEJEDA then instructed RIOS to deliver it to TEJEDA at TEJEDA's house.

153.     On September 10, 2004, at approximately 12:34 p.m. (call# 5214), RIOS placed an outgoing telephone call to TEJEDA. TEJEDA asked, "What up?" RIOS responded, "What's up? Are we going to do it?" TEJEDA responded, "Let me call you in about 10 minutes." Later that same

day, at approximately 4:31 p.m. (call# 5301), RIOS received an incoming telephone call from TEJEDA. RIOS asked, "Where are you?" TEJEDA responded, "Hey asshole. What happened?" RIOS asked, "What? Do I go there?" TEJEDA responded, "Yes asshole, give me about five minutes." RIOS answered, "That's fine, I'm here at Walmart, I'm going over there."

154.    Based on this investigation and my experience, and the experience of other law enforcement agents, in this call RIOS stated that he was either going to the place where he stores his drugs or to TEJEDA's ("I'm going over there").

155.    On September 15, 2004, at approximately 1:49 p.m. (call# 5671), RIOS received an incoming telephone call from TEJEDA. TEJEDA asked, "What's going on?" RIOS responded, "For, for... tomorrow." TEJEDA asked, "For tomorrow?" RIOS stated, "Yes, I'm waiting for the guy... in the morning, okay?" TEJEDA replied, "Okay."

156.    Based on this investigation and my experience, and the experience of other law enforcement agents, in this call TEJEDA called RIOS to inquire about the availability of cocaine for sale. RIOS told TEJEDA that he will probably have some in the morning but that he was waiting for his supplier.

157.    The next day, on September 16, 2004, at 1:06 p.m. (call# 5785), RIOS placed an outgoing telephone call to TEJEDA. RIOS asked, "Where are you?" TEJEDA responded, "Here at the house, asshole." RIOS stated, "I'll be there in two minutes." TEJEDA replied, "Okay." Surveilling agents then observed and photographed RIOS arrive and enter TEJEDA's residence.[48]

158.    Based on this investigation and my experience, and the experience of other law

---

[48] Agents knew they were photographing RIOS because they had previously viewed an APD booking photo of him.

57

enforcement agents, in this call RIOS told TEJEDA he had received the cocaine the two had discussed the day before. RIOS in this call arranged to deliver the cocaine to TEJEDA at TEJEDA's residence.

159.    On October 5, 2004, at approximately 1:04 p.m. (call# 9167), RIOS placed an outgoing telephone call to TEJEDA. RIOS told TEJEDA, "There is one, I'm going to take it to you ... I'll go over there in about 20 minutes." TEJEDA said, "Okay, call me."

160.    Based on this investigation and my experience, and the experience of other law enforcement agents, in this call the "one" that RIOS had for TEJEDA was a quantity of cocaine.

161.    Approximately twenty-four minutes later, at approximately 1:28 p.m. (call# 9171), RIOS placed an outgoing telephone call to TEJEDA. TEJEDA asked, "Are you here?" RIOS replied, "I'm almost there." TEJEDA said he would "leave the doors open." Surveilling agents then photographed RIOS' vehicle[49] parked in the driveway of TEJEDA's residence, and shortly thereafter, RIOS exiting TEJEDA's residence and departing.

162.    On October 8, 2004, at approximately 3:04 p.m. (call# 9469), RIOS received an incoming telephone call from TEJEDA. RIOS asked if they were going to "do it." TEJEDA said yes, but wanted to know where he should meet RIOS. RIOS gave TEJEDA directions to his house on Columbia Street, and explained that he would be standing outside the house. TEJEDA responded that he would call RIOS again when he was on his way to "pick that up." Nearby surveilling agents then observed RIOS standing outside of his residence.

163.    Based on this investigation and my experience, and the experience of other law

_____

[49] RIOS drives a blue Ford Tempo, and agents had observed him driving this Tempo prior to this date.

enforcement agents, this call reflects that TEJEDA was going to RIOS' house to pick up a supply amount of cocaine.

164.     Later that same day, at approximately 3:28 p.m. (call# 9487), RIOS placed an outgoing telephone call to TEJEDA. RIOS told TEJEDA to wait a little bit because "things are looking hot." TEJEDA stated that he was already on the way over, and RIOS then told TEJEDA that he would go to TEJEDA instead of having TEJEDA come to him. TEJEDA then told RIOS that they should meet at "El Guero," a local grocery store. RIOS responded, "Alright," and TEJEDA asked if RIOS was going there now. RIOS responded that he was.

165.     Based on this investigation and my experience, and the experience of other law enforcement agents, in this call RIOS told TEJEDA that there may be police in the area ("things are looking a little hot"). Agents who were simultaneously surveilling RIOS' residence during this call had observed that an Aurora patrol car was in the area.[50]

---

[50] It should be noted that on October 8, 2004, based on these intercepted calls, agents decided to conduct a traffic stop on APOLINAR DELGADO-RIOS. As outlined, agents had just intercepted a call between TEJEDA and RIOS in which the two had arranged in Spanish to meet at El Guero's, a grocery store in Aurora. However, agents monitoring the call misunderstood RIOS to say that he was meeting "el guero," a Spanish slang term for "the white guy," not that he was meeting *at* "El Guero," the grocery store. Thus, instead of waiting for RIOS to arrive at the "El Guero" grocery store, and curbing him at that time, agents curbed him prematurely, within minutes of the call.

During the course of the traffic stop, RIOS told investigators he lived at 741 Columbia Street, in Aurora, Illinois. Although agents searched RIOS's car upon curbing it, no drugs were found inside, which affiant believes is due to the fact that RIOS was curbed prematurely, before RIOS had the chance to obtain the cocaine he was going to deliver to TEJEDA at El Guero. In addition, agents asked permission to search his residence at 741 Columbia Street, and RIOS consented, executing a written consent to search and providing agents with keys to the residence. Upon searching the residence solely for drugs, and not for ledgers or papers, a drug sniffing dog accompanying agents found no drugs. Thus, agents believe DELGADO-RIOS likely stores his drugs elsewhere.

#### E.     LARRY BOWLES, aka "LARRY LOVE"

166.     CW-6 has stated that LARRY BOWLES, aka "LARRY LOVE," is an associate of TEJEDA who supplies TEJEDA with cocaine. CW-6 has advised agents that "LARRY LOVE" is LARRY BOWLES' nickname.  CW-6 and Aurora Police Department records indicate that LARRY BOWLES, aka "LARRY LOVE," is a long-time LATIN KING street gang member in Aurora, Illinois. CW-6 also advised agents that BOWLES used to reside at 1014 Superior Street in Aurora.

167.     CW-6 advised agents that s/he knows BOWLES to be TEJEDA's supplier. CW-6 first witnessed BOWLES sell cocaine to TEJEDA in approximately 2001.  According to CW-6, BOWLES sells approximately 1 - 2 kilograms of cocaine to TEJEDA approximately every week if he has the cocaine available. CW-6 last witnessed BOWLES sell cocaine to TEJEDA during the spring of 2004.

168.     On January 1, 2005, CW-6 was outfitted with a body-recording device, and recorded the following conversation between Individual R and BOWLES.  Individual R acknowledged on the recording that he had just purchased an "8-ball" from BOWLES, and told CW-6 that the quality was "Ok." TEJEDA then chimed in that BOWLES was "falling off," which CW-6 explained meant that BOWLES's cocaine quality had been poor as of late.

169.     CW-6 advised that on or about February 24, 2005, s/he was again with Individual R. CW-6 related that s/he was giving Individual R a ride, and Individual R was on the telephone talking to LARRY BOWLES. Individual R then gave the phone to CW-6 and CW-6 was told by BOWLES to go to his (BOWLES's) girlfriend's house.[51] Upon arriving there, BOWLES was sitting at the foot

---

[51] This house is 389 South Calhoun Street. LARRY BOWLES's girlfriend resides in the apartment with BOWLES. CW-3 and CW-6 have provided agents with the name of BOWLES's girlfriend, and Aurora city records indicate that the same woman has owned the residence located

of the bed in his bedroom. On a nearby shelf, CW-6 saw what appeared to be approximately one-quarter kilogram of cocaine and a scale. CW-6 then witnessed BOWLES weigh out one-half ounce of cocaine for Individual R. BOWLES told Individual R that he owed $250 for the half ounce, and $30 "from the other night." BOWLES then told Individual R to just pay him $275 and they would "be even." Later, Individual R told CW-6 that every time he and BOWLES are driving around and they see a cop, BOWLES gives Individual R the gun he is carrying and tells Individual R to hold it. Individual R also told CW-6 that BOWLES said he has too many guns, possibly three, and wants Individual R to hold two of them at his apartment.

170.    CW-6 has witnessed BOWLES "front" cocaine to TEJEDA during the summer of 2003. During the same period, TEJEDA advised CW-6 that he (TEJEDA) had to go to BOWLES' house to pick up cocaine that was stored there. CW-6 has observed TEJEDA with kilograms of cocaine that TEJEDA told her/him came from BOWLES. The kilograms of cocaine were wrapped in black plastic and secured by clear tape. According to CW-6, s/he has witnessed TEJEDA obtain kilograms from BOWLES approximately 5 times and overall, and has seen TEJEDA receive as many as 7-8 kilograms from BOWLES since 2003. CW-6 has also witnessed BOWLES with several different kinds of guns.

---

at 389 South Calhoun Street since on or about June 26, 2002. On February 26, 2005, agents conducted a surveillance of 389 South Calhoun Street, and observed a gray Chevrolet pick-up truck with Illinois license plate 56169F parked in the driveway. Secretary of State records reflect that this vehicle is registered to Individual U, LARRY BOWLES's brother, at 1016 Superior Street in Aurora, IL, and agents have seen BOWLES driving this truck many times. On February 26, agents observed LARRY BOWLES bent over the engine compartment of a brown vehicle also parked in the driveway of 389 South Calhoun Street. Agents identified BOWLES from booking photos they had previously obtained from APD.

61